**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 10-3598

SECRETARY OF LABOR,

Appellant

v.

JAMES DOYLE; CYNTHIA HOLLOWAY; MICHAEL
GARNETT; MARK MACCARIELLA; PITWU HEALTH
AND WELFARE; TIM FOSTER; FREEDMAN & LORRY;
DANTE GEORENO; NEIL S. GOLDSTEIN, ESQ.;
FRANKLIN MILITELLO; THE MCKEOUGH COMPANY;
UNION PRIVILEGE CARE, INC.; DAVID WEINSTEIN

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 1-05-cv-02264)
District Judge: Honorable Joseph H. Rodriguez

Argued on April 27, 2011

Before:  SLOVITER, GREENAWAY, JR., and ROTH,
Circuit Judges

(Opinion filed:  March 27, 2012)

Marcia E. Bove, Esquire **(Argued)**
Senior Trial Attorney
M. Patricia Smith, Esquire
Solicitor of Labor
Timothy D. Hauser, Esquire
Associate Solicitor, Plan
Benefits Security Division
Elizabeth Hopkins, Esquire
Counsel for Appellate and Special Litigation
United States Department of Labor
Room N-4611
200 Constitution Avenue, N. W.
Washington, DC   20210

Dennis K. Kade, Esquire
Patricia M. Rodenhausen, Esquire
Andrew Karonis, Esquire
Office of the Solicitor
U. S. Department of Justice
201 Varick Street
New York, NY   10014

                    Counsel for Appellant

Keith R. McMurdy, Esquire **(Argued)**
Fox Rothschild
100 Park Avenue, Suite 1500
New York, NY   10017

Counsel for Appellees

James Doyle
28 Sirius Court
Sewelll NJ  08080

Pro Se Appellee

O P I N I O N

**ROTH**, Circuit Judge:

This case concerns an action by the Secretary of Labor (the Secretary) against James Doyle, Cynthia Holloway, and others, arising from their alleged breach of fiduciary duties to the Professional Industrial Trade Workers Union (PITWU) Health & Welfare Fund (Fund), a health benefit plan governed by the Employee Retirement Income Security Act (ERISA).  After a bench trial, the District Court entered judgment for Doyle and Holloway.  The Secretary appeals the District Court's judgment, contending that the District Court failed to adequately address its breach of fiduciary duty arguments and to consider whether the defendants were

responsible for diversion of plan assets held by the Fund.[1] For the reasons that follow, we will vacate the judgment of the District Court and remand for additional factual findings.

## I. Background

### A. *Procedural History*

In April 2005, the Secretary brought this action for breach of fiduciary duty against Holloway, Doyle, the PITWU Fund, and two other defendants, Michael Garnett and Mark Maccariella. The Secretary's complaint alleged that PITWU had established a health benefit plan that was a "multi-employer welfare arrangement" (MEWA) governed by ERISA. Two companies, Privileged Care, Inc. (PCI) and NorthPoint PEO (NorthPoint or NP), enabled small businesses to obtain health benefits for their employees by enrolling the employees in the Fund, even though the employees never joined the union. Privileged Care Marketing Group (PCMG) marketed this scheme to small businesses. Businesses that chose to enroll their employees in the Fund were required to make benefit payments to PCMG. PCMG retained a portion of the payments as compensation and remitted the balance to PCI and NP. PCI and NP also

---

[1] Another defendant in this action, Michael Garnett, did not appear at trial and the District Court entered a default judgment against him. Garnett did not file a notice of appeal, but five months after the entry of judgment, he filed in this Court a *pro se* brief challenging the judgment. Because Garnett's appeal is untimely, we lack jurisdiction to consider it. *See* Fed. R. App. P. 4(a)(1)(B); *Bowles v. Russell*, 551 U.S. 205, 215 (2007).

4

retained a substantial portion of the payments as compensation and remitted the remainder to claims administrators established by the Fund. The complaint alleged that these payments were assets of the Fund improperly diverted by PCI, NP, and PCMG and that PCI, NP and PCMG were required by ERISA to use the assets only for the purpose of defraying reasonable plan expenses for the benefit of plan participants.

The complaint alleged that Garnett and Maccariella at various times owned and operated PCI and NorthPoint and were fiduciaries under ERISA because the payments they received from their business clients were assets of the Fund under their control. Garnett and Maccariella allegedly breached their fiduciary duties to the Fund by using assets of the Fund for purposes other than defraying reasonable plan expenses for the benefit of plan participants. The complaint similarly alleged that Doyle had owned and operated PCMG and that he was a fiduciary because he exercised discretionary control over payments that were assets of the Fund. It further alleged that Doyle had breached his fiduciary duties to the Fund by improperly using plan assets for his own benefit. Finally, the complaint alleged that Holloway was a named trustee of the Fund, had breached her fiduciary duties to the Fund, and was liable both directly and as a co-fiduciary for failing to detect and prevent the diversion of Fund assets by Garnett, Maccariella, and Doyle. The complaint sought restitution of losses to the plan, a permanent injunction against any of the defendants serving as a fiduciary or service provider to an ERISA plan, appointment of an independent fiduciary to manage the Fund, an accounting, costs, and other appropriate equitable relief.

After extensive discovery, the case proceeded to a bench trial in October 2009. *Solis v. Doyle*, No. 05-2264, 2010 WL 2671984 *3 (D.N.J. June 30, 2010). At the beginning of the trial, Maccariella accepted a consent judgment enjoining him from serving as fiduciary or service provider to an ERISA plan and requiring him to pay $195,317. A default judgment was entered against Garnett at the close of trial because he failed to appear at trial "[d]espite numerous continuances granted at his request."

## B. *The District Court's Findings*

The District Court made the following factual findings based on the bench trial. In 2000, David Weinstein established PITWU. Holloway owned and operated Employers Depot, Inc. (EDI), a professional employer organization (PEO) that she had established in 1989.[2] At some point in 2000, she learned of PITWU from a health insurance broker. An attorney, Neil Goldstein, who later became counsel to the Fund, provided Holloway with verification of PITWU's union status. On May 1, 2001,

---

[2]A professional employer organization (PEO) provides human resources and administrative services to business clients – typically small to medium size businesses – and often handles its clients' payroll, workers' compensation, and health and retirement benefits. *See generally United States v. Jennings*, 599 F.3d 1241, 1245 (11th Cir. 2010); *Tri-State Emp't Servs., Inc. v. Mountbatten Sur. Co., Inc.*, 295 F.3d 256, 263 (2d Cir. 2002). PEOs often arrange with their clients to be considered as co-employers of their clients' employees to facilitate management of human resource functions for their clients.

Holloway and three other trustees established the PITWU Fund by an Agreement and Declaration of Trust. The Fund initially had two employer members, EDI and Employers Consortium, Inc. (ECI). The EDI and ECI employees were enrolled as participants in the Fund. The Trust Agreement obligated EDI and ECI to make regular contributions to the Fund for each of their employees covered by the Fund. The Fund made annual filings with the federal government, had trustees, counsel, an actuary, and claims administrators. The District Court found that counsel for the Fund never expressed a concern that PITWU was not a valid union or that the Fund was not a valid multi-employer fund.

### 1.  *PCI/NP and PCMG*

In January 2002, ECI terminated its relationship with PITWU. PCI and NP then became employer members of the PITWU Fund. PCI and NP entered into identical collective bargaining agreements (CBA) with PITWU in which they agreed to make contributions to the Fund so that their employees could receive health benefits under the Fund.[3] The CBAs provided that PITWU had "been designated by a majority of employees in certain client companies of [PCI/NP] as their exclusive bargaining representative for those terms and conditions of employment controlled by [PCI/NP] as per its 'client Service Agreement.'" The "client Service Agreement" referred to a PEO Services Contract, which was executed by clients of PCI/NP who wished to

---

[3]"PCI and [NP] were effectively the same organization in that they shared consultants, office space, owners, and employees." *Id.* at *4.

obtain health benefits for their employees.[4]    Once an employer executed the contract and began making contribution payments, its employees would become members of the PITWU union and obtain access to health benefits from the Fund.  Although the contract allowed clients to choose not to join the PITWU union, clients were required to select the union option to obtain health benefits for their employees through PCI/NP's CBAs with the Fund. Similarly, the contract listed a number of additional PEO services, but the only service consistently offered by PCI/NP was health benefits through the PITWU Fund.[5]

After PCI/NP became an employer member of the Fund, Holloway and another trustee appointed Weinstein as a trustee of the Fund.  Later in May, Weinstein sold PCI/NP to

---

[4]PCI/NP's PEO Services Contract contained a co-employment clause stating that PCI or NP "and Client shall be considered co-employers for those employees provided to the Client by [PCI or NP] (designated employees) for . . . purposes" of compliance with certain federal civil rights laws, ERISA, and the Federal Drug Free Workplace Act or any state equivalent.

[5] PCI/NP attempted at some point to offer payroll services—payment of employees' checks and payment of payroll taxes—but one business owner that selected this service testified at trial that he discontinued it after several months because PCI/NP had failed to make the necessary tax payments, subjecting the business to significant penalties.

8

Garnett, resigned as trustee, and was replaced by Garnett.[6]

Doyle's company, PCMG, marketed the services of a variety of entities, including PCI/NP.[7]  In January of 2002, ariety of entities, including PCI/NP.[8]  In January of 2002, Doyle signed a Marketing Service Agreement with PCI, in which PCMG agreed to market PCI's services for a fee. PCMG also collected payments from PCI/NP's clients. Clients made payments by two checks, one to PCI/NP for participation in the Fund (Check 1), and one to PCMG for administrative service fees (Check 2).  PCMG received both checks and would forward the first on to PCI/NP.  It retained the second check to cover its expenses, which included sales commissions paid to PCMG's sales consultants and fees for additional services selected by the client, such as gap insurance.[9]  PCMG also provided monthly reports to PCI/NP

---

[6] Garnett operated the company until August 2002, when Maccariella took over.  Maccariella operated PCI/NorthPoint until it ceased operations in March 2003.

[7] PCI/NP did not market its services exclusively through PCMG.  For example, Weinstein's wife also brought a number of clients to PCI/NorthPoint.

[8] PCI/NP did not market its services exclusively through PCMG.  For example, Weinstein's wife also brought a number of clients to PCI/NorthPoint.

[9] Gap insurance is purchased to cover potential gaps in insurance coverage, for example when an employee is

regarding funds received and paid certain union dues.

At some point, PCMG stopped marketing for PCI/NP, but continued to provide billing and administrative services until May 2003. PCMG received $4.5 million in Check 1 funds, and $2.1 million in Check 2 funds.[10] PCMG forwarded $3.1 million of the Check 1 funds to PCI/NP, and paid $645,000 directly to claim administrators and medical providers.[11] In addition to the $3.1 million received from PCMG, PCI/NP also directly received $816,000 from employers enrolled in the Fund through Weinstein's wife. Of this roughly $3.9 million, PCI/NP sent $2.1 million to claims administrators to pay employee health benefit claims. Thus, in total, PCMG and PCI/NP collected $7.4 million in payments relating to the Fund, but only $2.7 million was sent to claim administrators for the payment of health benefit claims. The remaining $4.7 million was retained by PCMG or PCI/NP.

---

between jobs. PCMG made between $20,000 and $33,000 in payments for gap insurance. *Id.* at *4 n.4.

[10] Doyle testified that PCMG made a net profit of $112,788.13. A substantial portion of the Check 2 monies was used to pay PCMG's sales consultants, who received $1.3 million in total (although not all of this money was related to promotion of PCI/NorthPoint).

[11] The record before the District Court indicates that this $645,000 was sent after November 2002. At that time, PCI/NorthPoint stopped making required contributions to the Fund and Doyle was instructed by Fund's trustees to send Check 1 monies directly to claims administrators.

## 2. *Management of the Fund*

The Fund retained a third-party claims administrator to pay health benefit claims by employees covered by the Fund. The Fund's first claims administrator was Union Privileged Care (UPC), which was owned by Weinstein. Oak Tree Administrators (Oak Tree) replaced UPC as claims administrator and served in that capacity from March to June of 2002.[12] In a meeting with Oak Tree in April 2002, Holloway learned of many pending claims and of Oak Tree's concern that claims may not have been paid since November 2001. In May 2002, Oak Tree reported that it had still not obtained necessary documents and financial information from UPC and therefore could not provide the trustees with a financial report; moreover, the Fund's actuary could not perform a study on the financial condition of the Fund. Holloway also decided in May 2002 to appoint Weinstein as trustee of the Fund despite "general concerns" she had about him. On September 20, 2002, the Fund's new claims administrator, Brokerage Concepts, Inc., informed Holloway of problems relating to lack of funding because of PCI/NP's failure to make contributions to the Fund and other problems arising from inadequate paperwork.[13]

---

[12] A claims administrator is an entity that processes employee benefit claims to ensure that they are legitimate and consistent with plan documents, and then arranges for payment of valid claims.

[13] The District Court's opinion uses Benefits Concepts, Inc. and Brokerage Concepts, Inc. interchangeably. Holloway referred to the entity as Brokerage Concepts and we follow her usage. In December 2002, Southern Plan

11

These problems were illustrated by the testimony of five business owners who had obtained access to the Fund through PCI/NP. They testified that they had difficulty presenting claims and did not have claims paid to their satisfaction. Additionally, several of these witnesses testified that they did not consider their employees unionized or part of the PITWU union. One employer was assured by PITWU union officials that PITWU brought small businesses "under its umbrella for purposes of medical benefits and payroll, but that there was no interest in unionizing the employees."[14]

In response to these problems, Holloway asked Goldstein, the Fund's attorney, "to bring some accountability to the Fund, but he asked [Holloway] to talk to the trustees about that." She also asked Goldstein to obtain membership information from PCI. However, Holloway did not seek mediation of disputes with other trustees regarding the management of the Fund or seek to remove any trustee.[15] Nor did she demand an audit of PCI/NP or PCMG or contact the Department of Labor to complain about the lack of funding, lack of financial accountability, or "chaotic state of

Administrators replaced Brokerage Concepts, Inc. as claims administrator for the Fund.

[14] It is not clear whether the District Court credited this testimony; it did note, however, that the Secretary had not presented any signed enrollment forms establishing that the employees of these businesses were enrolled in the Fund.

[15] The District Court did not describe Holloway's disputes with several of the trustees, but Holloway's resignation letter refers to these disputes.

affairs." Instead, on September 27, 2002, Holloway resigned as trustee. She identified several reasons leading to her resignation, including the lack of financial accountability for contributions to the Fund and resulting lack of funding to pay claims. She described the "vulnerability of the Fund due to actions taken by membership that has created insolvency of the Fund." Holloway also noted that several states had issued cease and desist orders "based on the representation by other membership/trustees that PITWU [was] an insurance program."[16]

Holloway continued to participate in the administration of the Fund after her resignation. In October 2002, for example, Holloway met with Brokerage Concepts to discuss the Fund's lack of funding. She agreed that contribution rates should be increased. EDI, Holloway's company, used its own funds to satisfy claims by its clients' employees that were not paid by the Fund. Holloway also sought to resolve outstanding claims with health care providers and sought payment of claims from Southern Plan Administrators.

3. *The District Court's Conclusions*

The District Court concluded that the Secretary had failed to show that Holloway or Doyle breached their fiduciary duties to the Fund. Although the Secretary argued at length that funds collected by PCI/NP were plan assets

---

[16] The Fund's attorney would draft responses to these orders stating, as Holloway put it, "this is a union-sponsored plan, it is not insurance, you state commissioners don't have jurisdiction over this."

governed by ERISA, the court did not make any findings of facts or conclusions of law as to which of the monies received by PCI/NP and PCMG – if any – were plan assets. Instead, the court focused on whether the Secretary had established that necessary contributions had not been made to the Fund or that the Fund had unpaid claims when it closed on May 2003. The court noted the Secretary's concession that she did "not allege that defendant Holloway failed to collect contributions from employers" and the testimony of the Secretary's summary witness that none of the financial analyses presented by the Secretary would have indicated to an observer that the Fund was underfunded. The court also noted Doyle's unrefuted testimony that the fees charged by PCI/NP and PCMG were customary and reasonable, and observed that the Secretary introduced no evidence that the fees charged by PCI/NP or PCMG "were excessive, unreasonable, or contrary to plan documents.

## C. *Additional Evidence*

In addition to the District Court's factual findings, we summarize additional evidence in the record that we find relevant to our legal analysis.

### 1. *PCI/NP's Evasion of State Insurance Regulation*

We find significant the cease and desist orders issued by insurance commissioners of seven states against PCI/NP, PCMG, Doyle, and in some cases, the PITWU Fund and Holloway. Some regulatory background is necessary to understand the significance of these orders. Providing and selling insurance, including health insurance, is generally

14

regulated by the states. *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 387 (2002). Certain self-insured employer and union plans that are subject to ERISA's funding, vesting, and fiduciary standards are exempted from state insurance regulation.[17] *See* 29 U.S.C. §§ 1003(a), 1144(b)(2)(B). However, health insurance plans involving multiple employers are deemed "multi-employer welfare arrangements" (MEWAs) under ERISA, *see* 29 U.S.C. § 1002(40)(A), and are subject both to ERISA standards and to state insurance regulation, *see id.* § 1144(b)(6). Nevertheless, certain union-sponsored health insurance plans covering union members working for multiple different employers are excepted from the definition of MEWA and thus remain exempt from state insurance regulation.[18] *See* 29 U.S.C. § 1002(40)(A)(i). It is not disputed that the Fund was a MEWA, and therefore subject both to ERISA standards and to state insurance regulation. *See* 29 U.S.C. § 1144(b)(6).

The record illustrates that, even though the Fund was properly considered a MEWA and therefore subject to state insurance regulation, PCI /NP and PCMG marketed the Fund as a self-insured union sponsored plan, exempted from state regulation. This connection to the union was reinforced by a form that PCI/NP required its clients to sign entitled

---

[17]This rough summary of ERISA's complex preemption scheme is provided only as background. *See Moran*, 536 U.S. at 364-65 (noting complexity of ERISA's preemption scheme).

[18]In 2003, the Department of Labor promulgated regulations setting forth criteria for bona fide union health and retirement plans. *See* 29 C.F.R. § 2510.3-40.

"Professional Industrial Trade Workers Union Health & Welfare Fund Plan "B" Disclosure Form," which stated:

> This health & welfare plan is sponsored by the Professional Industrial Trade Workers Union (P.I.T.W.U.). The plan is self-funded and exempt from state regulation, as outlined in the Employment Retirement Income Security Act (ERISA) of 1974. The plan is under the jurisdiction of the United States Secretary of Labor. This plan is not regulated by any state department of insurance. The plan being self-funded is not covered by any state or federal guarantee fund in the event of fund insolvency.

PCI/NP and PCMG thus relied on the Fund's relationship with PITWU to claim that ERISA exempted the Fund, and their marketing of the Fund, from state regulation.

From the outset, this scheme attracted the scrutiny of state insurance regulators. In January 2002, less than a month after PCI/NP and PCMG were created, the Oklahoma Insurance Commissioner entered a cease and desist order against PCI, PCMG, and two of its marketing affiliates, finding that they were engaging in the unauthorized sale of insurance and ordering them to cease and desist from any further sales or marketing of insurance in the state.[19]

In June 2002, the Louisiana Insurance Commissioner issued a cease and desist order based on its finding that PCI

---

[19] The record contains a certified mail slip showing that this order was received by PCMG on February 4, 2002.

16

and PCMG were selling health insurance without authorization. The Louisiana Commissioner found that PCI purported to offer PEO services, including health benefits, to its clients. PCI "allegedly assumes the role of 'co-employer' to the employees of its client employers" and thereby provided these employees access to the Fund, pursuant to a CBA between PCI and the Fund. However, the Commissioner found, *inter alia*, that

> [T]here is no collective bargaining for wages or improved working conditions as in a bona fide union agreement. . . . Employees of the employers contracting with PCI . . . do not directly join the union, and receive no representation or benefit from PITWU other than access to the union sponsored health plan. One "employer" from Louisiana who contracted with PCI and enrolled in the health and welfare fund did not include employees or activate any PEO services other than the health benefits.

The Commissioner concluded that PITWU was a self-insurance plan covering employees of multiple employers and had not acquired the necessary authorization to sell insurance in Louisiana.[20] The Commissioner summarized several of

---

[20]ERISA exempts from state insurance regulation certain self-insured employee health benefit plans maintained by a single employer for its employees or by a union for its members. *See* 29 U.S.C. §§ 1003(a), 1144(a)-(b). Benefit plans established for employees of multiple employers, however, are not exempted from state regulation. *See id.* § 1144(b)(6).

17

PCI, PCMG, and their affiliates' marketing practices as follows:

> The individuals and entities named above have been involved directly or indirectly in making, issuing, circulating, or causing to be made, issued, or circulated written and oral statements in the form of sales presentations and marketing materials used to solicit potential marketing agents and prospective client employers for PCI by, 1) misrepresenting to the public, and on an official document filed with the Louisiana Department of Insurance, that the PITWU or Privilege Care Employee Health and Welfare Fund is not insurance and therefore exempt from regulation under state laws governing insurance and insurance agents; 2) deceptively claiming that PCI's "health benefit services" have been approved by the Louisiana Department of Insurance; 3) falsely claiming that a [sic] official representative of the Louisiana Department of Insurance had been invited and wanted to attend a "compliance and training" meeting held by PCMG and PCI in Louisiana on May 16, 2002; and 4) falsely claiming that PCI had been licensed by the Louisiana Department of Labor as a PEO doing business in this state; 5) falsely representing that PCMG had not been issued a cease and desist order prior to April 20, 2002; and 6) violating several prohibitory laws of this state.

The Commissioner accordingly ordered PCI, PCMG, the

PITWU Fund, Weinstein, Doyle, Garnett, Oak Tree Administrators, and several affiliates to cease and desist from marketing or providing health care services in the state.

By the time the Fund ceased operations in May 2003, five other states – North Carolina, Texas, Massachusetts, Colorado, and Illinois – had entered similar orders against PCI/NP, the PITWU Fund, PCMG, Doyle, and others. Several of these orders were based on hearings before state insurance commissioners at which it emerged that, as in Louisiana, PCI/NP purported to offer PEO services but actually offered almost exclusively health benefits through the Fund by enabling its clients' employees to obtain health benefits from the Fund without union membership. Several of the later cease and desist orders also noted that the Fund had numerous unpaid claims -- for example, Colorado's Insurance Commissioner noted that as of December 9, 2002, the Fund had over $7 million in unpaid claims.

The findings of these insurance commissioners are corroborated by the record before the District Court. Evidence showed that PCI/NP required its clients to sign a disclosure form in which it falsely represented that the PITWU Fund was "exempt from state regulation, as outlined in the Employment Retirement Income Security Act (ERISA) of 1974." At the bench trial, five managers whose businesses contracted with PCI/NP testified that their employees were not unionized. One witness stated that he had been assured by PITWU officials that the union had no interest in unionizing employees – it was merely a means of providing health insurance and other benefits. The business owners also testified to serious problems resulting from unpaid claims for health benefits from the Fund. Financial data presented by

the Secretary supports this testimony, showing that the Fund had $7.6 million in unpaid claims on October 31, 2002.

Both Doyle and Holloway were aware of at least some of the cease and desist orders. Doyle had contact with insurance commissioners in some states and participated in some of the related proceedings.[21] He is named in each of the orders, and in several cases the record contains certified mail slips confirming that he or PCMG received copies of the orders.[22] Holloway also learned of some of the cease and desist orders while serving as trustee, mentioning them in her resignation letter as one of her reasons for resigning. But the extent of her knowledge about the orders is unclear, and the

---

[21]The Louisiana Insurance Commissioner noted that Doyle had falsely represented in filings before the Commission that PCMG had not been "subject to regulatory action including cease and desist orders, revocations of license, or similar actions," even though PCMG had received a cease and desist order from the Oklahoma Insurance Commission only two months before filing its application.

[22]Although not clearly related to this case, on October 27, 2007, Doyle pleaded guilty to a felony violation of Texas laws against selling unauthorized insurance, was sentenced to five years of community supervision, and agreed to pay $380,788.39 in restitution to unspecified victims. The indictment to which Doyle pleaded guilty is not included in the record, however, and the judgment of conviction states that the offense was committed on February 1, 2001, several months before the Fund was created and nearly a year before PCMG began marketing for PCI/NP.

20

orders with the most troubling findings were issued after her resignation. As the District Court found, the Fund's attorney assured Holloway that he would respond to these orders, arguing that "this is a union-sponsored plan, it is not insurance, you state commissioners don't have jurisdiction over this."

We find it significant that PCI/NP's promotion of the Fund bears striking similarities to the type of scheme that ERISA's MEWA provisions were specifically designed to prevent: an aggressively marketed, but inadequately funded health benefit plan masquerading as an ERISA-exempt plan in order to evade the solvency controls imposed by state insurance regulation.[23] Although the record is not entirely

---

[23] *See Legislative Hearing on Pension Issues, Hearing on Hr. 1641, H.R. 3632, H.R. 6462 Before the Subcomm. on Labor-Management Relations of the H Comm. on Education and Labor*, 97th Cong. 1-2 (1982) (statement of Rep. Burton explaining that MEWA amendments were made to prevent "fraudulent" insurance trusts from using ERISA preemption to sell health insurance to small businesses without "comply[ing] with the basic solvency controls which each State establishes to protect health care consumers").

Although the Secretary claims that PITWU was a "bogus" union, we think this claim is too strong. The record shows that the CBAs between PITWU and PCI/NorthPoint were bogus – they were not the result of bona fide collective bargaining, and the employees it enrolled in the union by PCI/NorthPoint were not genuine union members – but no similar evidence was presented concerning the CBAs between PITWU and its other employer members, ECI and EDI.

clear on this point, it appears that the ultimate result of this arrangement was that which Congress feared:  the Fund was ultimately unable to pay all employee claims, and thus employees participating in the Fund were not provided promised health benefits.[24]  Doyle and Holloway were not the principal architects of this scheme, and the question presented by this case is the extent of their awareness of the scheme and liability for its consequences.  But we think it is important to keep the nature of the scheme firmly in mind.

## 2.  Holloway's Management of the Fund and Subsequent Resignation

We also find relevant some additional details concerning Holloway's management of the Fund.  It appears from the record that Holloway first learned of problems with the management of the Fund in a meeting in April 2002 with the Fund's claims administrator at that time, Oak Tree Administrators, and the Fund's trustees.  The meeting minutes, prepared by Holloway, report that:

---

[24]The District Court noted that the Secretary did not submit enrollment forms and establish that there were valid participant benefit claims that should have been paid pursuant to the plan documents and noted that "there was no testimony to the effect that as of the date of the closure of the PITWU Fund in May 2003, there were any claims unpaid by the Fund."  We do not disturb this finding, but simply note that it is highly unlikely that all $7 million in unpaid employee claims as of December 2002 were invalid claims; or that the Fund somehow managed to pay all valid, outstanding claims before closing in May 2003.

22

It was discussed that several boxes of unpaid claims had been shipped from Union Privilege and that Oak Tree was inputting all the claims to determine the magnitude of requirements. It was noted that many claims were very old and dated back to mid 2001 with no claims reflecting payment since November 2001. Cindy Holloway requested a date for the all [sic] claims to be entered into the data base. Oak Tree advised that this would be completed by the following Tuesday, April 30.

The Fund's actuary reported that he had not been paid by UPC and was owed $10,000; the trustees authorized payment of the bill. The trustees also learned in the meeting that two new health benefit plans – *i.e.*, new types of coverage with different pricing schemes – had been added to the Fund by PCI/NP without their approval. One of the trustees, Dante Georeno, observed that "he didn't see a problem with the plans, although the premium rates were very low, because the plans have limited coverage. The plans were already in use and the [summary plan descriptions] already in the hands of the membership. It was therefore determined the plans would be continued." Additionally, Oak Tree noted that enrollment applications submitted by PCI/NP were not complete. A week after this meeting, Holloway and the other trustees agreed to appoint Weinstein, the owner and operator of UPC and PCI/NP, as a trustee of the Fund.[25]

---

[25]Holloway did not investigate Weinstein's qualifications before agreeing to appoint him. But at some point prior to resigning as trustee, Holloway learned from the Fund's attorney that Weinstein had been the subject of a

23

The trustees held another meeting on May 30, 2002. A draft of the minutes from the meeting prepared by the Fund's attorney indicates that Weinstein resigned at that meeting and was replaced by Garnett, who succeeded him as owner and operator of PCI/NP. The Fund's accountant informed the trustees that he could not prepare a financial statement for the Fund because certain financial information he had requested from UPC had not yet been provided. The Fund's actuary reported to the trustees that he had received some information from Weinstein but was still missing necessary information about the number of claims for prescription benefits submitted by plan participants and the number of participants enrolled per plan per month. Without this data, he was unable to offer an opinion as to whether the Fund's "reserves were adequate to meet its ongoing needs." Oak Tree also reported that it was awaiting additional information from Weinstein and UPC. Weinstein then joined the trustees' meeting and they developed a list of information that Weinstein would provide; the trustees directed UPC and Oak Tree to provide all necessary data to the Fund's accountant and actuary within two weeks. According to Holloway, the Fund's attorney sent Weinstein a letter after the meeting to confirm the request for information.

On September 20, 2002, Holloway learned from the Fund's latest claims administrator, Brokerage Concepts, that it was having problems paying claims because PCI/NP had stopped making contributions to the Plan and that necessary

cease and desist order from the state of Florida in connection with an organization called "NAPT." Holloway could not recall whether she learned this before or after agreeing to appoint him as trustee to the Fund.

24

information and paperwork from PCI/NorthPoint was lacking. The District Court found that (1) Holloway instructed the Fund's attorney "to bring some accountability to the Fund, but he asked [Holloway] to talk to the trustees about that," and (2) Holloway "took steps to try to get membership information from PCI." It is not clear from the record whether Holloway followed up on these requests before submitting her resignation letter on September 27, 2002.[26]

Holloway's resignation letter enumerated 15 specific reasons for resigning, which she explained were "examples and are not representative of all the issues related to my resignation." Many of these reasons related to disagreements with other trustees about their approach to Fund management. For example, she strongly disagreed with the other trustees' dismissal of Oak Tree Administrators without consulting her. Her reasons for resigning also included:

> e. Lack of continuity or communication by the Union representatives.
>
> f. No financial accountability for contributions to the Health and Welfare Fund by other membership. Employers Depot [Holloway's company] provided monthly audits and accountability since the inception of the program.
>
> g. Lack of proper follow through to ensure that

---

[26]The letter is dated September 20, 2002, and is not signed, but Holloway stipulated that she submitted the letter to the other Fund trustees on September 27, 2002.

Union Privilege provided required financial records to the accountants and actuary that determined the financial solvency of the fund.

h. Establishment of two additional plans without the consent of the Trustees.

i. Contribution rates established for two additional plans without the expressed consent of the Trustees or approval by actuary.

j. Vulnerability of the fund due to actions taken by membership that has created insolvency of the fund.

k. The consensual approach by the PITWU to allow staff of certain membership to make decisions, develop programs and direct the outcome of contracts and TPA activity.

l. Cease and desist orders in multiple states based on the representation by other membership/Trustees that PITWU is an insurance program.

m. Legal issues with the Department of Insurance in multiple states due to the representation by other membership that PITWU is an insurance program.

n. Lack of follow through by responsible parties to ensure the structure, insurance

26

programs and related requirements are managed timely and effectively.

Holloway expressed concern about "the chaotic state of affairs of the Fund," which had "brought undue damage in multiple states, created credit damage to the membership due to claims that are in excess of 9 months old and generally has ruined the credibility of the Union and its associated fiduciaries." Holloway did not find another person to replace her as trustee before resigning, nor was she immediately replaced.[27]

## III. <u>Discussion</u>

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and we have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. In considering an appeal from a bench trial, we "review the District Court's findings of fact for clear error and its conclusions of law de novo."[28] *Travelers Cas. and Sur. Co. v. Ins. Co. of North Am.*, 609 F.3d 143, 156 (3d Cir. 2010) (brackets omitted).

---

[27] Tim Foster was later appointed a trustee of the Fund. It is not clear from the record whether Holloway ever communicated her concerns to Foster or whether Foster ever read her resignation letter.

[28] Holloway moved for a directed verdict at the close of the bench trial and the District Court mistakenly styled its opinion as a ruling on a directed verdict under Fed. R. Civ. P. 50. Because there was no jury trial in this case, we treat the court's decision as a ruling on partial findings of fact under Fed. R. Civ. P. 52 and review it accordingly. *See Fed. Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 32 (1st Cir. 2007).

## A. *Determination of Plan Assets*

The Secretary urges in this appeal that the District Court erred in failing to determine whether payments collected by PCI/NP and PCMG were plan assets subject to ERISA. We agree. The identification of plan assets in this case determines ERISA's reach. If, as the Secretary claims, all of the money collected from employers by PCI/NP and PCMG were plan assets from the moment of collection, then Doyle may be a fiduciary by virtue of exercising control over those assets, *see* 29 U.S.C. § 1002(21)(A)(i), and, if he is a fiduciary, he and Holloway may be liable for breaching their fiduciary duties with respect to those assets. *See* 29 U.S.C. §§ 1104(a), 1105(a), 1109(a). But if, as Doyle and Holloway claim, the payments collected by PCI/NP and PCMG were not plan assets, and the only assets of the Fund were those payments received by the Fund's claims administrators, then Doyle did not handle any plan assets, and could not be a fiduciary under ERISA, and Holloway's duties as a fiduciary were not implicated by PCI/NP's and PCMG's disposition of the payments they collected from employers.

### 1. *Doyle's Fiduciary Status*

Identification of plan assets is essential to determining Doyle's fiduciary status. Under ERISA, even if a person is not named as a fiduciary in plan documents, he may still be "a fiduciary with respect to a plan to the extent . . . he . . . exercises any authority or control respecting management or disposition of its assets . . . ." 29 U.S.C. § 1002(21)(A)(i); *see also Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002).

28

The Secretary argues that Doyle was a fiduciary because all or part of the payments that PCMG collected from PCI/NP's clients were plan assets and Doyle, as head of PCMG, exercised discretionary control over those assets. Doyle contends that the payments PCMG collected from employers who enrolled their employees in the Fund were not plan assets and that the only plan assets were funds remitted to the Fund's claim administrators pursuant to the collective bargaining agreements between PITWU and PCI/NP.

The District Court, however, made no findings as to which, if any, of the monies under Doyle's control were plan assets, or whether Doyle was a fiduciary. Instead, the District Court appears to have concluded that Doyle could not have breached any fiduciary duties he might have owed to the Fund based on (1) his testimony that he forwarded all required Check 1 monies, and (2) his testimony that the Check 2 monies he collected as marketing fees were "customary" and the absence of evidence that the fees were "excessive, unreasonable, or contrary to plan documents." *Doyle*, 2010 WL 2671984 *7-8. Both of these conclusions are problematic.

First, the District Court's findings cast doubt on Doyle's testimony that he forwarded all required Check 1 monies. The court found that Doyle had collected $4.5 million in Check 1 monies, of which $3.1 million was forwarded to PCI/NP and $645,000 was sent directly to the Fund's claim administrator pursuant to instructions from the Fund's trustees after PCI/NP stopped making contributions in November 2002. *Doyle*, 2010 WL 2671984 *4. But this leaves $755,000 of the $4.5 million collected by Doyle unaccounted for. Doyle's claim that he properly forwarded

all required Check 1 monies cannot be credited without addressing this $755,000 discrepancy between the amounts Doyle collected and the amounts he transmitted to PCI/NP or the Fund's claims administrator. In any case, the District Court would still need to determine whether Check 1 monies were plan assets and whether Doyle exercised sufficient control over those monies to be considered a fiduciary. *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 346-47 (3d Cir. 2004).

Second, Doyle's unrefuted testimony that the Check 2 funds he collected for marketing fees were customary or reasonable does not mean that he did not violate any fiduciary duties under ERISA. If Check 2 monies were plan assets and Doyle was a fiduciary, he was required to use these monies "for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries [and] defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The Check 2 monies retained by PCMG were used to pay expenses it incurred in marketing the Fund. It is far from obvious how plan participants benefitted from PCMG's marketing of the Fund to other businesses with whom they had no connection or why the Fund would reasonably incur such expenses. Moreover, as we have explained above, the "PEO services" of PCI/NP that PCMG was promoting were actually part of a scheme to abuse ERISA preemption and avoid state insurance regulations through a sham collective bargaining relationship with PITWU. At a minimum, expenditures for marketing this

illegal scheme were not reasonable expenses for the benefit of plan participants.[29]

Accordingly, on remand, the District Court should make detailed factual findings concerning the nature of the funds received and controlled by Doyle to determine which, if any of these funds, were plan assets. The court should specifically address whether Check 1 and Check 2 monies were "plan assets," considering in particular those monies sent at the direction of the trustees directly to claims administrators. If the District Court determines on remand that some or all of these monies are "plan assets," it should then consider whether Doyle had sufficient control over these assets to support a finding of fiduciary status. *See In re Mushroom Transp. Co., Inc.*, 382 F.3d at 346-47. If the District Court finds that Doyle is a fiduciary with respect to certain plan assets, it should then consider whether Doyle breached his fiduciary duties to the Fund. *See* 29 C.F.R. § 2509.75-8, FR-16; *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir. 2002).

### 2. *Holloway's Liability*

The identification of plan assets is also important to the Secretary's breach of fiduciary duty claims against Holloway. It is undisputed that, as a trustee, Holloway was a

---

[29] The mere fact that activities violate applicable state or federal regulations does not mean that expenditures for such activities are automatically unreasonable or improper under 29 U.S.C. § 1104(a)(1)(A). The expenditures at issue here are unusual because their principal purpose was to promote a scheme that improperly circumvented state and federal regulations designed to protect plan participants.

31

named fiduciary, and thus was obligated to discharge her duties to the Fund "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Secretary primarily argues that Holloway failed to act prudently to prevent the improper diversion of Check 1 and Check 2 monies by PCI/NP and PCMG. The District Court did not address this argument, however, apparently because it concluded that Holloway did not breach any fiduciary duties owed to the Fund.

Holloway contends that "there was no evidence that Ms. Holloway acted in a way that caused the Fund to (i) fail to provide benefits to eligible participants or be underfunded, (ii) fail to defray costs, or (iii) fail to adhere to plan documents." That argument, however, only addresses some of the fiduciary duties enumerated in ERISA § 404(a), which is not an exhaustive list.[30] *See Glaziers & Glassworkers*

---

[30]ERISA describes a fiduciary's duties to a plan as follows:

> a fiduciary shall discharge his duties with respect to a plan in the interest of the participants and beneficiaries and --

> (A) for the exclusive purpose of:

> (i) providing benefits to participants and their beneficiaries; and

> (ii) defraying the reasonable expenses of administering the plan;

*Union Local No. 252 Annuity Fund v. Newbridge Sec.*, 93 F.3d 1171, 1180-81 (3d Cir. 1996).

Rather, ERISA § 404(a) incorporates the fiduciary standards of trust law, of which several are relevant here. *See id.* at 1180. In particular, a trustee has a duty to maintain financial records and to preserve and protect the assets of the plan, including from diversion or embezzlement. *See* Restatement (Third) of Trusts §§ 76(2)(b), 83; *Ream v. Frey*, 107 F.3d 147, 156 (3d Cir. 1997). Because the District Court did not resolve the question of plan assets, it did not address the Secretary's arguments regarding the question of Holloway's knowledge of asset diversion or her corresponding duties, if any. Those arguments turn on close

---

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a).

questions of fact regarding what Holloway knew and could reasonably be expected to know.

In addition, a trustee must also take prudent precautions, such as by providing for a "suitable and trustworthy replacement," to ensure that his resignation does not harm the Fund or its beneficiaries. *See Ream*, 107 F.3d at 154. Because the record does not indicate who replaced Holloway as trustee, it is unclear whether that person is "suitable and trustworthy."

Finally, when confronted with suspicious circumstances, a trustee may be required to investigate potential risks to a plan. *See Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006). The record indicates that Holloway took several steps to rectify recordkeeping problems. The District Court failed, however, to address whether Holloway had a duty to investigate, how extensive an investigation would have been required, or whether an adequate investigation would have revealed the Fund's potential insolvency and/or the diversion of assets.

If Holloway has breached any of these duties, as the Secretary contends, then she may be liable for any resulting loss of plan assets.[31] The Secretary's claims cannot be

---

[31]The Secretary argues that Holloway is both directly liable for losses to the plan under ERISA § 409, 29 U.S.C. § 1109, and liable as co-fiduciary under ERISA § 405(a), 29 U.S.C. § 1105(a). If the District Court finds that some of the Check 1 and/or Check 2 monies were plan assets and that Holloway breached her fiduciary duties, it should consider whether Holloway is liable for any resulting losses of plan assets under both theories. Additionally, even if the District

evaluated, however, without first determining whether any of the Check 1 or Check 2 monies were plan assets that Holloway was obligated preserve. Accordingly, as explained above, the District Court should make appropriate findings as to which, if any, of these monies were plan assets. If on remand the District Court finds that any of the monies retained by PCMG or PCI/NP were plan assets, it should then consider whether Holloway breached her fiduciary duties relating to those assets and is liable for any resulting losses to the plan. In considering Holloway's fiduciary duties, the District Court should resolve the relevant questions of fact, including those raised above.

## B. *Identification of Plan Assets*

To facilitate the District Court's analysis on remand, we provide the following guidance on identification of plan assets under ERISA. The term "plan assets" is not comprehensively defined in ERISA or in the Secretary's regulations. ERISA provides that "the term 'plan assets' means plan assets as defined by such regulations as the Secretary may prescribe . . . ."[32] 29 U.S.C. § 1002(42). The

---

Court finds that none of the Check 1 or Check 2 monies were plan assets, it should still consider whether Holloway breached any of the fiduciary duties discussed above, as such a finding is relevant to the injunctive relief sought by the Secretary.

[32]The statute also establishes specific rules to determine when an entity's assets become assets of a retirement plan by virtue of the plan's ownership of an equity interest in the entity. 29 U.S.C. § 1002(42).

Secretary's regulations define the scope of "plan assets" in two specific contexts: (1) where an employee benefit plan invests assets by purchasing shares in a company, 29 C.F.R. § 2510.3-101, and (2) where contributions to a plan are withheld by an employer from employees' wages, 29 C.F.R. § 2510.3-102. The first regulation is not relevant here, and the second regulation does not apply because the Secretary has not presented any evidence that employer contributions to the Fund were withheld from the wages of employees participating in the Fund. *See In re Luna*, 406 F.3d 1192, 1199 n.3 (10th Cir. 2005).

As the Tenth Circuit Court of Appeals has persuasively explained, in the absence of specific statutory or regulatory guidance, the term "plan assets" should be given its ordinary meaning, and therefore should be construed to refer to property owned by an ERISA plan.[33] *See In re Luna*, 406 F.3d at 1199 (considering dictionary definition of "asset" and noting that "[c]entral to the definition of 'asset,' then, is that the person or entity holding the asset has an ownership

---

[33]Some courts have adopted a functional approach to defining plan assets, which considers "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Acosta v. Pac. Enters.*, 950 F.2d 611, 620 (9th Cir. 1991) (holding that list of shareholders held by plan was a plan asset). Although this approach may be helpful when considering whether items other than cash or financial instruments are properly considered assets of an ERISA plan, the parties do not argue for its application in this case, and we do not think that it helps to determine which of the payments at issue here were assets of the Fund.

interest in a given thing, whether tangible or intangible"). This approach is also consistent with guidance provided by the Secretary on the meaning of "plan assets," which states that "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. In general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest." Department of Labor, Advisory Op. No. 93-14A, 1993 WL 188473 *4 (May 5, 1993); *see also Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007) (finding "the Secretary's reasoning in its rulings regarding 'plan assets' thorough, valid, and particularly consistent" and adopting the Secretary's definition).[34]

As a general rule, the first step in identifying the property of an ERISA plan is to consult the documents establishing and governing the plan. *Cf. In re Lucent Death Benefits ERISA Litig.*, 541 F.3d 250, 254-55 (3d Cir. 2008). A court should then, in light of these documents, consult

---

[34]The Supreme Court has also strongly suggested that this is the proper approach to defining "plan assets." *See Jackson v. United States*, 129 S. Ct. 1307 (2009) (vacating Fourth Circuit's holding that unpaid employer contributions were plan assets and remanding for further consideration "in light of the position asserted by the Solicitor General in his brief for the United States"); Brief for United States at 11-12, 2009 WL 133443, at *11-*12, *in Jackson v. United States* (explaining that "in situations not covered by the plan asset regulations, 'the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law'").

contracts to which the plan is a party or other documents establishing the rights of the plan. *See, e.g.*, *Metzler v. Solidarity of Labor Organizations Health & Welfare Fund*, No. 95-7247, 1998 WL 477964, *6 (S.D.N.Y. Aug. 14, 1998), *aff'd* 224 F.3d 128 (2d Cir. 2000) (per curiam), *cert. denied* 533 U.S. 928 (2001); *Galgay v. Gangloff*, 677 F. Supp. 295, 301-02 (M.D. Pa. 1987), *aff'd* 932 F.2d 959 (3d Cir. 1991). The Secretary further argues that representations made by PCI/NP and PCMG to businesses which purchased health benefits from the Fund should also be considered in determining what monies were assets of the Fund. Given the District Court's limited factual findings, we are reluctant to rule on this argument. We merely note that such representations are relevant only to the extent that they affect the property rights of the Fund under ordinary property law principles. We leave it to the District Court to determine on remand what representations were made and their relevance, if any, to the Fund's property rights.

## IV. <u>Conclusion</u>

For the foregoing reasons, we will vacate the judgment of the District Court in favor of Holloway and Doyle and remand for further proceedings consistent with this opinion.