PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1581
_____

CONNIE J. EDMONSON,
individually and on behalf of all others
similarly situated

v.

LINCOLN NATIONAL LIFE INSURANCE COMPANY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 2-10-cv-04919
(Honorable Michael M. Baylson)
_____

Argued November 13, 2012

Before: SCIRICA, FISHER, and JORDAN, *Circuit Judges*.

(Filed: August 7, 2013)


M. Scott Barrett, Esq.
Barrett & Associates

320 West 8th Street
Suite 100, P.O. Box 5233
Bloomington, IN 47407

John C. Bell, Jr., Esq. (ARGUED)
Lee W. Brigham, Esq.
Bell & Brigham
457 Greene Street
Augusta, GA 30901

Jeffrey G. Casurella, Esq.
Suite 310
400 Interstate North Parkway
Atlanta, GA 30339

Cary L. Flitter, Esq.
Flitter Lorenz
450 North Narberth Avenue
Suite 101
Narberth, PA 19072
    *Counsel for Appellant Connie J. Edmonson*

David H. Pittinsky, Esq. (ARGUED)
Joel E. Tasca, Esq.
Ruth S. Uselton, Esq.
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103
    *Counsel for Appellee Lincoln National Life Insurance Company*

Waldemar J. Pflepsen, Jr. Esq.

Jorden Burt
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, DC  20007
   *Counsel for Amicus Curiae American Council of Life*
   *Insurers*

_____

OPINION OF THE COURT

_____

SCIRICA, *Circuit Judge*.

Plaintiff Connie Edmonson was a beneficiary of a life insurance plan established by her employer and governed by the Employee Retirement Income Security Act of 1974 (ERISA). Defendant Lincoln National Life Insurance Co. chose to pay her benefits using a retained asset account, which allowed it to hold onto the benefits and invest them for its own profit until Edmonson affirmatively chose to withdraw them from the account.

Edmonson claims Lincoln breached its fiduciary duty of loyalty under ERISA and seeks disgorgement of the profit Lincoln earned by investing the benefits owed to her. The District Court granted summary judgment in Lincoln's favor, concluding Lincoln was not acting in a fiduciary capacity when it took the actions subject to complaint. We will affirm.

I. Background

Connie Edmonson's husband was insured under a group life insurance policy issued by Lincoln. The policy was established under an ERISA employee benefit plan sponsored by Edmonson's employer, Schurz Communications. When her husband died, Edmonson was entitled to $10,000 in benefits. The policy states, "[u]pon receipt of satisfactory proof of a Dependent's death while insured under this Policy, the Company will pay the amount of the Dependents [sic] Life Insurance in effect on the date of such death," and that "[a]ny benefits payable under this Policy will be paid immediately after the Company receives complete proof of claim." The policy does not state that Lincoln will pay the benefits using a retained asset account and does not otherwise specify how Lincoln was to pay Edmonson the benefits.

Edmonson submitted a claim form to Lincoln for payment. The form stated that when the benefits are greater than $5,000, Lincoln's usual method of payment is to open a SecureLine Account in the beneficiary's name. After Lincoln approved Edmonson's claim, it set up a SecureLine Account in her name in the amount of $10,000, and sent her a checkbook from which she could draw checks on the account. Lincoln explained to Edmonson that she would receive interest on the account in the amount of the Bloomberg national average rate for interest-bearing checking accounts plus 1%. Lincoln also explained that if Edmonson wanted the entire proceeds immediately, all she had to do was write one check for the entire balance.

The SecureLine Account was a retained asset account. When distributing benefits using retained asset accounts, an insurance company does not deposit any funds into the account. Rather, it merely credits the account with the

4

benefits, and when a beneficiary writes a check on the account, the insurance company transfers funds into the account to cover the check. Until that time, the insurance company retains the money owed to the beneficiary (the "retained assets"), and can invest the retained assets for its own profit.

Three months after Lincoln set up the SecureLine Account, Edmonson withdrew the full amount of the insurance proceeds. Lincoln wrote her a check for $52.33 of interest. Edmonson contends that the profit Lincoln earned from investing the retained assets was greater than the amount of interest paid to her, and that Lincoln made approximately $5 million in profit in 2009 by investing retained assets credited to her account and the accounts of other beneficiaries.

Edmonson brought an ERISA claim contending Lincoln violated its fiduciary duties under ERISA by choosing to pay her using a retained asset account and by investing the retained assets for its own profit. She contends ERISA's fiduciary duties were implicated because both acts involved exercising "discretionary authority or discretionary control respecting management" or "administration" of an ERISA plan and exercising "authority or control respecting management or disposition of [plan] assets." 29 U.S.C. § 1002(21)(A) (setting forth the various functions that trigger ERISA fiduciary duties). She argues Lincoln's acts breached its fiduciary duties because these actions were not taken for her exclusive benefit and because they involved self-dealing. *See id.* § 1104(a)(1) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .

providing benefits to participants and their beneficiaries."); *id.* § 1106(b)(1) ("A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account."). Edmonson seeks disgorgement of the profits earned by Lincoln from the investment of the retained assets under 29 U.S.C. § 1132(a)(3), which allows a participant, beneficiary, or fiduciary to obtain equitable relief to redress violations of ERISA.

Lincoln moved to dismiss, arguing Edmonson lacked both constitutional and statutory standing to bring her claim. It also argued it was not acting as a fiduciary under ERISA when it took the actions subject to complaint and, even if it were, it did not breach any fiduciary duty by taking these actions. *See Edmonson v. Lincoln Nat'l Life Ins. Co.*, 777 F. Supp. 2d 869, 876 (E.D. Pa. 2011). The trial court rejected all of Lincoln's arguments. *Id.* at 874. The court first concluded Edmonson had standing under Article III because she suffered an injury-in-fact based on the amount of the spread between the interest Lincoln paid to her and the profit it earned by investing the retained assets. *Id.* at 881. The court then concluded Edmonson had statutory standing under ERISA, rejecting Lincoln's argument that Edmonson was no longer a "beneficiary" of an ERISA plan once the SecureLine Account was closed. *Id.* at 883. Finally, the court concluded Edmonson had sufficiently alleged that Lincoln breached its fiduciary duties under ERISA. *Id.* at 892.

Following discovery, Lincoln moved for summary judgment on the ground that it was not a fiduciary under ERISA when it took the contested actions. Edmonson moved for partial summary judgment on the same issue. Edmonson also moved to certify a class of individuals who were paid

6

ERISA benefits by Lincoln via a retained asset account. The court granted Lincoln's motion for summary judgment, denied Edmonson's motion for partial summary judgment, and dismissed as moot Edmonson's motion for class certification. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 899 F. Supp. 2d 310, 313 (E.D. Pa. 2012). The court concluded Lincoln's actions were not governed by ERISA fiduciary duties because the acts did not involve the administration or management of the plan and did not involve exercising authority or control over plan assets. Edmonson appeals, contending the court erred with respect to both conclusions.[1]

## II. ERISA's Fiduciary Principles

"'ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.'" *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). To protect participants in employee benefit plans and their beneficiaries, ERISA "'establish[es] standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1001(b)). ERISA defines the circumstances under which a person or entity is a fiduciary, sets forth the duties of these fiduciaries, and provides various causes of action designed to promote the enforcement of these duties.

Under ERISA,

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2). We have jurisdiction under 28 U.S.C. § 1291.

7

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). "'ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan.'" *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009) (alteration and emphasis in original) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)). "Accordingly, '[f]iduciary duties under ERISA attach not just to particular persons, but to particular persons performing particular functions.'" *Id.* (alteration in original) (quoting *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990)). The definition of a fiduciary under ERISA is to be broadly construed. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233 (3d Cir. 1994) (citing *Smith v. Hartford Ins. Grp.*, 6 F.3d 131, 141 n.13 (3d Cir. 1993)).

Among other duties, ERISA requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants

8

and their beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA further requires that "[a] fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account." *Id.* § 1106(b). At least in one respect, these duties can be characterized as a fiduciary's duty of loyalty.

Edmonson contends Lincoln was acting as a fiduciary both when it chose to pay her using a retained asset account and when it later invested the retained assets for its own profit. She argues both acts were constrained by fiduciary duties because the acts involved the management or administration of the plan, or alternatively, because the acts involved exercising authority or control over plan assets. Lincoln argues that it was no longer acting as an ERISA fiduciary when it took the challenged acts and, alternatively, that these acts did not breach its duty of loyalty.

ERISA provides for private enforcement of its duties by creating causes of action available to participants, beneficiaries, and fiduciaries. Edmonson brings her disgorgement claim under 29 U.S.C. § 1132(a)(3), which allows a participant, beneficiary, or fiduciary to bring a cause of action "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." The Supreme Court has described §1132(a)(3) as a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." *Varity*

9

*Corp. v. Howe*, 516 U.S. 489, 512 (1996) (quotation omitted).[2]

### III. Standing

On appeal, amicus American Council of Life Insurers argues Edmonson lacks standing to bring her claim because she suffered no injury-in-fact, as she received all the benefits owed to her under the policy, plus interest. The District Court rejected this argument, concluding Lincoln's failure to pay Edmonson the full amount of the profit it earned from investing the retained assets constituted for standing purposes an injury-in-fact. The court concluded Edmonson's injury was the "spread" between the interest Lincoln earned by investing the retained assets and the interest it paid to her. *Edmonson*, 777 F. Supp. 2d at 881. The court rejected Lincoln's argument that Edmonson suffered no injury merely because she received all she was entitled to under the plan and policy. *See id.*

Although Lincoln did not appeal this ruling, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties

---

[2] Based on the language of § 1132, "[t]he Supreme Court has reasoned that '[e]quitable relief must mean *something* less than *all* relief,' and therefore it has explained that § 1132(a)(3) authorizes only 'those categories of relief that were *typically* available in equity,'" i.e., not claims available at law. *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, 306 (3d Cir. 2008) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002)).

either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011). We review the legal conclusions related to standing *de novo*, "but review for clear error the factual elements underlying the District Court's determination of standing." *Gen. Instrument Corp. v. Nu-Tek Elecs. & Mfg.*, 197 F.3d 83, 86 (3d Cir. 1999).

Article III of the United States Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). "Courts enforce the case-or-controversy requirement through the several justiciability doctrines that 'cluster about Article III.'" *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). These doctrines "include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." *Id.* Standing is "perhaps the most important of these doctrines." *Allen*, 468 U.S. at 750.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First, the plaintiff must suffer an injury-in-fact that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical. *Id.* Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). "Third, it must be likely, as opposed to merely speculative, that the

11

injury will be redressed by a favorable decision." *Id.* (quotation omitted).

We begin with the first requirement, injury-in-fact. Generally, disgorgement claims for breach of fiduciary duty do not require that a plaintiff suffer a financial loss, as relief in a disgorgement claim "is measured by the defendant's profits." Restatement (Third) on Restitution and Unjust Enrichment § 51 cmt. a (2011); *see also id.* § 43 cmt. d (stating a claim based on a breach of the duty of loyalty may be brought "without regard to economic injury"); *id.* (providing examples where fiduciary is liable for gains even though plaintiff suffered no loss). This is because disgorgement claims seek not to compensate for a loss, but to "deprive[] wrongdoers of ill-gotten gains." *Commodity Futures Trading Comm'n v. Am. Metals Exchange Corp.*, 991 F.2d 71, 76 (3d Cir. 1993) (quotation omitted). *See S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("[D]isgorgement is . . . an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs . . . .") (citations omitted).[3] A requirement of a net financial loss would allow

---

[3] In contrast, a claim for restitution seeks to compensate a plaintiff for a loss, so a financial loss is required to bring such a claim. As the Court of Appeals for the Fifth Circuit has explained, "disgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs. Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does." *Huffman*, 996 F.2d at 802 (citations omitted).

fiduciaries to retain ill-gotten profit—exactly what disgorgement claims are designed to prevent—so long as the breaches of fiduciary duty do not harm the plan or beneficiaries. Accordingly, the nature of disgorgement claims suggest that a financial loss is not required for standing, as a loss is not an element of a disgorgement claim.

The principles of ERISA provide further support for this conclusion. ERISA's duty of loyalty bars a fiduciary from profiting even if no loss to the plan occurs. Under 29 U.S.C. § 1109(a), ERISA provides that plans can recover that profit whether or not the plan suffered a financial loss. *See Leigh v. Engle*, 727 F.2d 113, 122 (7th Cir. 1984) ("ERISA clearly contemplates actions against fiduciaries who profit by using trust assets, even where the plan beneficiaries do not suffer direct financial loss.").[4] "The purpose behind this rule is to deter the fiduciary from engaging in disloyal conduct by denying him the profits of his breach." *Amalgamated Clothing & Textile Workers Union v. Murdock*, 861 F.2d

---

[4] Nothing in the text of ERISA suggests a beneficiary must suffer a financial loss in order to bring a suit against a fiduciary for breach of the duty of loyalty. The duty of loyalty is unqualified, as ERISA provides that a fiduciary "*shall . . . discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries*" and that the fiduciary "*shall not . . . deal with the assets of the plan in his own interest or for his own account.*" 29 U.S.C. §§ 1104(a)(1), 1106(b) (emphases added).

1406, 1411 (9th Cir. 1988) (citing G. Bogert and G. Bogert, *The Law of Trusts and Trustees* § 543, at 218 (2d ed. 1978)).[5]

Notwithstanding these principles, the amicus contends our decision in *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003), requires a plaintiff to show a financial loss in order to have standing to bring a disgorgement claim. The plaintiff's claim in *Horvath* was that her HMO failed to disclose details of cost-control incentives offered to participating physicians, and thus violated ERISA's duty to make full disclosures. She sued for restitution, disgorgement, and an injunction barring the defendant from omitting information regarding physician incentives from its disclosures to plan members. *Id.* at 455. We first concluded the plaintiff did not need to "demonstrate actual harm in order to have standing to seek injunctive relief." *Id.* at 456. But because her claims for restitution and disgorgement sought monetary relief for herself, as opposed to the plan, we concluded those claims "are individual in nature and therefore

---

[5] These principles are consistent with the law of trusts, which "often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." *Varity Corp.*, 516 U.S. at 497. A financial loss is not a requirement for a disgorgement claim under trust law. *See* Restatement (Third) of Trusts § 100 cmt. c (explaining a trustee "is liable for any profit he has made through his breach of trust even though the trust has suffered no loss"); *see also Scanlan v. Eisenberg*, 669 F.3d 838, 846 (7th Cir. 2012) (holding a plaintiff had standing to bring a state law disgorgement claim even though her ultimate distributions were not diminished by the breach of fiduciary duty).

require her to demonstrate individual loss." *Id.* (citing *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 159 (3d Cir. 1999)). She acknowledged, however, she had suffered no direct financial loss and conceded "that the care and coverage she received as a member of the [HMO] was never affected by the existence of physician incentives." *Id.* Instead, she contended her injury was that her firm overpaid for the healthcare she received and that, absent the breach, the firm would have passed any savings on to her. *Id.* We rejected this "diminished value" theory of injury as a means to satisfy the injury-in-fact requirement. *Id.* at 456-57. We also concluded the plaintiff's theory was "far too speculative to serve as the basis for a claim of individual loss" because it rested "not only on the troublesome assumption that a factfinder can accurately determine the amount [the plaintiff's] firm allegedly overpaid [the HMO], but also on the notion that the firm would have passed these savings on to its employees in the form of a higher salary or additional benefits." *Id.* at 457.

Our decision in *Horvath* did not revolve around whether the plaintiff suffered a financial loss. The *Horvath* plaintiff never contended she suffered a financial loss, as her employer paid all the premiums to the HMO and did not make any deductions from employee paychecks. *Id.* at 452. Despite this fact and her concession that she received all she was entitled to under the plan, we went on to determine whether she nevertheless had demonstrated an individual loss. Accordingly, we doubt *Horvath* should be read to require a financial loss. Nothing in *Horvath*, beyond any possible connotation of the word "loss," states or implies that a net financial loss is required for standing to bring a disgorgement claim. Accordingly, we disagree with the amicus' contention

15

that *Horvath* requires a financial loss for standing to bring a disgorgement claim.

Rather, the question in *Horvath* was whether the plaintiff could bring individual claims for restitution and disgorgement or whether any relief had to be sought by the plan.[6] She contended that her firm overpaid for the healthcare she received due to the defendant's breach. But because she sought relief for herself individually, we stated she must show an *individual* right to recover those overpayments. She attempted to do by arguing that she would have received more benefits or a higher salary absent the breach, but she failed to make this showing. Any injury, and thus any right to relief, accrued only to the plan, not to the individual plan members. Accordingly, we believe *Horvath* holds that a plaintiff must show she has an individual right to the

---

[6] Notably, for the proposition that an "individual loss" is required, the *Horvath* court cited to *In re Unisys Savings Plan Litigation*, 173 F.3d at 159, which in turn cited to *Varity Corp.*, 516 U.S. at 507-15. These cases neither discuss the requirements for a disgorgement claim nor provide any support for an argument that a financial loss is required for standing to bring a disgorgement claim. Rather, like *Horvath*, both of these cases focus on the difference between a claim brought by an individual and a claim brought on behalf of the plan. *See Varity Corp.*, 516 U.S. at 507-15 (comparing causes of action under ERISA available to plans and individuals); *In re Unisys*, 173 F.3d at 159 (concluding the plaintiff's claim failed because his expert "referred only to those losses incurred *by the Fund* and not to any losses incurred by individual participants named as plaintiffs").

defendant's profit and that when a plan has the right to the profit, the individual plaintiff has not suffered a constitutional injury.

Therefore, we conclude a financial loss is not a prerequisite for standing to bring a disgorgement claim under ERISA. As discussed, such a rule would be contrary to the nature of a disgorgement claim, principles of trust law, and principles of ERISA. Edmonson is seeking recovery based on Lincoln's use of assets that belonged to her. Unlike in *Horvath*, any right to recover belongs to her, not to the plan, and there has been no suggestion to the contrary. Accordingly, we agree with the District Court that, for standing purposes, Edmonson incurred an injury-in-fact because she "suffered an individual loss, measured as the 'spread' or difference" between the profit Lincoln earned by investing the retained assets and the interest it paid to her. *Edmonson*, 777 F. Supp. 2d at 881; *see also Vander Luitgaren v. Sun Life Ins. Co. of Canada*, No. 09-11410, 2010 WL 4722269, at *1 (D. Mass. Nov. 18, 2010) (rejecting argument that plaintiff lacked standing to sue for disgorgement of profit earned via a retained asset account). *But see Faber v. Metro. Life Ins. Co.*, No. 08-10588, 2009 WL 3415369, at *5 (S.D.N.Y. Oct. 23, 2009) (reaching opposite conclusion).[7]

---

[7] Although the Court of Appeals for the Second Circuit affirmed the district court in *Faber*, 648 F.2d 98 (2d Cir. 2011), the issue regarding standing for disgorgement claims was not addressed on appeal. The Second Circuit only discussed whether the plaintiff had constitutional standing to seek injunctive relief, *id.* at 103, and explicitly declined to reach the question of whether the plaintiff had standing to seek disgorgement, *id.* ("[O]ur merits analysis does not

17

Finally, the amount of the alleged injury, Lincoln's profit, is not hypothetical or speculative. There is evidence of how much profit Lincoln earned by making investments with its general asset pool, in which the retained assets were held. It is a question of mathematics to determine how much of Lincoln's profit was the result of its investment of Edmonson's $10,000. Importantly, Edmonson's claim is not that, had Lincoln not set up the SecureLine Account, she would have invested the retained assets on her own. Accordingly, it does not matter that there is no evidence of how she would have used the benefits had they not been retained by Lincoln.

To summarize, an ERISA beneficiary suffers an injury-in-fact sufficient to bring a disgorgement claim when a defendant allegedly breaches its fiduciary duty, profits from the breach, and the beneficiary, as opposed to the plan, has an individual right to the profit.[8] As Edmonson has met these requirements, we conclude that for standing purposes she suffered an injury-in-fact..

---

depend on whether Faber also has standing to seek disgorgement . . . . In light of our ultimate conclusion that the complaint fails to state a claim, we are not required to answer th[is] question[].").

[8] As *Horvarth* demonstrates, not every breach of duty will cause beneficiaries to suffer an injury-in-fact sufficient to bring a disgorgement claim. In cases like *Horvath*, when the right to a defendant's profit belongs to the plan, a beneficiary has not suffered a constitutional injury.

18

The second requirement of Article III standing, causation, requires that "the alleged injury-in-fact is causally connected and traceable to an action of the defendant[]." *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000); *see Lujan*, 504 U.S. at 560. We have described this requirement as akin to "but for" causation and found the traceability requirement met even where the conduct in question might not have been a proximate cause of the harm, due to intervening events. *The Pitt News*, 215 F.3d at 360-61 (finding traceability requirement met where regulation was cause-in-fact of newspaper's lost revenue when third parties stopped buying advertisements because of the regulatory action). Lincoln's acts of selecting the method of payment and then investing the retained assets allowed Lincoln to profit. Edmonson could have prevented Lincoln from profiting after it set up the SecureLine Account by immediately withdrawing all of her benefits. Nevertheless, we conclude Edmonson's injury—Lincoln's decision to keep the profit for itself—is "fairly traceable" to its initial decision to pay her via the retained asset account. *Allen*, 468 U.S. at 751.

The final element of constitutional standing is redressability, which requires that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation omitted). Edmonson contends she is entitled to Lincoln's profit via disgorgement.[9] Therefore, we conclude

---

[9] For standing purposes, we assume without deciding that Edmonson is correct that ERISA's disgorgement remedy would entitle her to Lincoln's profit even though it complied with its contractual requirement to pay her interest at an agreed-upon rate.

19

Edmonson has standing under Article III to bring her disgorgement claim against Lincoln for allegedly breaching its fiduciary duty of loyalty.

## IV. Statutory Standing

In addition to having Article III standing, an ERISA plaintiff must also have statutory standing. *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007). "Statutory standing is simply statutory interpretation," and we ask whether the remedies provided for in ERISA allow the particular plaintiff to bring the particular claim. *Id.* As discussed, Edmonson seeks disgorgement under § 1132(a)(3), which only provides for "appropriate equitable relief."

Lincoln argues that not all disgorgement is necessarily equitable in nature, relying on *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002). In *Great-West Life*, the Court held that relief under § 1132(a)(3) is only available when a plaintiff seeks equitable restitution, as opposed to restitution available only at law. The Court explained that "not all relief falling under the rubric of restitution is available in equity. In the days of the divided bench, restitution was available in certain cases at law, and in certain others at equity." *Id.* at 212. For example, when a "plaintiff could *not* assert title or right to possession of particular property, but . . . nevertheless might be able to show just grounds for recovering money . . . the plaintiff had a right to restitution *at law*." *Id.* at 213 (quotation omitted). "In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where

20

money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* The Court further explained that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant," as a claim for breach of contract does. *Id.* at 214. Rather, restitution lies in equity when the relief seeks "to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.[10]

The Court noted, however, that "an accounting for profits, a form of equitable restitution," is a "limited exception" to its rule defining the nature of equitable remedies. *Id.* at 214 n.2. "If, for example, a plaintiff is entitled to a constructive trust on particular property held by the defendant, he may also recover profits produced by the defendant's use of that property, even if he cannot identify a particular res containing the profits sought to be recovered." *Id.* The relief sought by Edmonson falls within this exception to the general principles established in *Great-West Life*, as disgorgement and accounting for profits are essentially the same remedy. *See* Restatement (Third) on Restitution and

---

[10] When we distinguished restitution from disgorgement above, we were using the term restitution to refer to a particular remedy. Restitution, however, can also be used more generally "as a metonym for the class of remedies particularly identified" with unjust enrichment. *See F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 370 (2d Cir. 2011). The Court in *Great-West Life* was using the term in the latter sense and, accordingly, its analysis applies to claims for disgorgement.

Unjust Enrichment § 51(4); *id.* cmt. a ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profit.'"); *see also Great-West Life*, 534 U.S. at 217 (instructing courts to look to the Restatements for guidance). The disgorgement remedy is equitable even though Lincoln no longer has possession of the retained assets, making a claim for a constructive trust unnecessary. *See Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 213 (3d Cir. 2004) (concluding that a claim to recover interest earned on illegally retained benefits is equitable under *Great-West Life* even though the defendant had voluntarily paid the benefits over to the plaintiff, meaning that no constructive trust over the benefits was required). Accordingly, we conclude Edmonson's claim for disgorgement, which is akin to an accounting for profits, is an equitable remedy available under ERISA and *Great-West Life*.[11]

## V. Merits

---

[11] The dissent concludes Edmonson lacks statutory standing because she cannot demonstrate she would be entitled to a constructive trust over the retained assets, as the dissent contends Edmonson had legal title over the assets (we question whether Edmonson had legal title over $10,000 that had not been segregated from Lincoln's general asset pool and over which Lincoln had complete control). More importantly, whether Edmonson could have asserted a constructive trust over the retained assets goes to the merits of her claim, not to statutory standing.

We now turn to the merits of Edmonson's claim that Lincoln breached its ERISA duty of loyalty. The trial court concluded Lincoln was not acting as a fiduciary when it took the actions subject to complaint and granted Lincoln's motion for summary judgment.[12]

To recapitulate, Edmonson contends Lincoln violated ERISA when it selected the SecureLine Account as the method of payment and again when it invested the retained assets for its own profit. She argues both of these acts triggered ERISA fiduciary duties because they involved the management or administration of the plan, or alternatively, an exercise of authority or control over plan assets. Lincoln acted as a fiduciary if either of the two challenged actions involved either type of conduct.

Whether the use of retained asset accounts runs afoul of ERISA is a question of first impression in this circuit. Two of our sister circuits have considered this question, but have come to different conclusions. *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 107 (2d Cir. 2011) (concluding the use of a retained asset account did not violate ERISA when the insurance policy provided for it); *Mogel v. UNUM Life Ins. Co.*, 547 F.3d 23, 26-27 (1st Cir. 2008) (concluding the use of a retained asset account did violate ERISA when the insurance policy required a lump sum payment). The parties

---

[12] "We review a district court's grant of summary judgment *de novo*, applying the same standard the district court applied." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

23

rely heavily on these two cases, so we will begin with a synopsis of them. But there is a key factual distinction between these cases and our case: the plan and policy in our case are silent as to how Lincoln is to pay Edmonson.

In *Mogel,* the policies at issue provided that "'all benefits payable . . . will be paid as soon as the Insurance Company receives proof of claim acceptable to it' and '[u]nless otherwise elected, payment for loss of life will be made in one lump sum.'" 547 F.3d at 25 (alterations in original). The Court of Appeals for the First Circuit held the plaintiffs had alleged a breach of fiduciary duties because payment via a retained asset account did not satisfy the requirement that payment be made in a lump sum. *Id.* at 26-27. The court rejected the defendant's argument that the selection of the retained asset account method of payment occurred after it had fulfilled its fiduciary duties, which the defendant apparently contended involved merely processing and approving the claim. *Id.* at 26. The court stated that the defendant's contention "rests on quicksand," because "it obscures reality" to argue the plaintiffs had received the required lump sum payment when the defendant set up the retained asset account. *Id.* The court concluded the defendant had not "completed its fiduciary functions under the plan," and thus the plaintiffs had alleged a breach of fiduciary duty. *Id.*

In *Faber*, the plan documents for one of the policies at issue stated, "[p]ayment of a death benefit of $7,500 or more is made under MetLife's Total Control Account [i.e., a retained asset account]. The death benefit amount is deposited in an interest bearing money market account and your beneficiary is provided with a checkbook to use for writing

24

checks to withdraw funds." 648 F.3d at 100-01. The plan documents for the other policies at issue similarly provided, "[i]f the benefit from a single claim is $6,000, or more, your beneficiary may receive basic life insurance benefits under one of the several options available under the Beneficiary's Total Control Account (TCA) Program." *Id.* at 101. The Court of Appeals for the Second Circuit held the insurance company did not violate ERISA when paying the benefits via a retained asset account, in part because the plan documents expressly allowed it to do so. *Id.* at 107. The court concluded

> MetLife discharged its fiduciary obligations as a claims administrator and ceased to be an ERISA fiduciary when, in accordance with the Plans, it created Plaintiffs' [retained asset accounts], credited them with the amount of benefits due, and issued checkbooks enabling Plaintiffs to withdraw their proceeds at any time. Thus, MetLife was not acting in a fiduciary capacity when it invested the funds backing Plaintiffs' [retained asset accounts].

*Id.* at 104. The court then determined that the retained assets were not plan assets, because the plan had no ownership interest in them at the time defendant invested them. *Id.* at 106. Accordingly, the defendant was not acting in a fiduciary capacity when it invested the retained assets, and plaintiffs' ERISA claim failed.

### A. Selection of the Method of Payment

Edmonson argues Lincoln breached its fiduciary duty when it selected the SecureLine Account as the method of

25

paying her benefits. She argues Lincoln was acting as a fiduciary when it took this action because this act involved the management or administration of the plan or, alternatively, because this act involved exercising authority or control over plan assets. *See* 29 U.S.C. § 1002(21)(A). We hold that Lincoln was acting as a fiduciary when it chose to pay her via the SecureLine Account and, to this extent, we depart from the thoughtful analysis of the trial court. We conclude, however, as we later explain, that Lincoln did not breach its fiduciary duty when it selected this form of payment.

1.

Edmonson contends that the selection of the SecureLine Account as the method of payment triggered ERISA fiduciary duties because it involved the "management" or "administration" of the plan. 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or . . . has any discretionary authority or discretionary responsibility in the administration of such plan . . . ."). Only discretionary acts of plan administration or management trigger fiduciary duties. "Since discretionary authority, responsibility or control is a prerequisite to fiduciary status, it follows that persons who perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles." *Confer v. Custom Eng'g Co.*, 952 F.2d 34, 39 (3d Cir. 1991). Accordingly, when a plan or policy requires the performance of an act of plan management or administration in a specific manner, then ERISA's fiduciary duties are not implicated.

26

But when the plan or policy permits some leeway in how an act is performed, then the discretionary choice on how to perform that act is cabined by ERISA's fiduciary duties.

To define the terms "management" and "administration" of a plan under ERISA, we "look to the common law, which, over the years, has given to terms such as 'fiduciary' and trust 'administration' a legal meaning to which, we normally presume, Congress meant to refer." *Varity Corp.*, 516 U.S. at 502. "The ordinary trust law understanding of fiduciary 'administration' of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents." *Id.* (citing Restatement (Second) of Trusts § 164 (1957)). "At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries." *Pegram v. Herdrich*, 530 U.S. 211, 231 (2000).

Although Lincoln initially contended the selection of the method of payment was neither discretionary nor an act of plan administration or management, it conceded at oral argument that this act was governed by ERISA's fiduciary duties.[13] Lincoln had the choice whether to pay Edmonson with the SecureLine Account or with some other form of payment. This is the definition of discretion. *Cf. Faber*, 648 F.3d at 104-05 (emphasizing that the plan at issue provided for the insurance company to pay the benefits using a retained asset account). The choice of how to pay Edmonson also

---

[13] The able District Court did not have the benefit of this concession when ruling on the motions for summary judgment.

stands in clear contrast with those activities the Department of Labor has given as examples of ministerial acts. *See* 29 C.F.R. § 2509.75-8 (listing, for example, the application of rules determining eligibility for participation or benefits, calculation of services and compensation credits for benefits, preparation of employee communications material, calculation of benefits, advising participants of their rights, collection of contributions, and processing of claims).

Lincoln's selection of the method of payment was an act of plan administration or management. Lincoln's "disposition to the beneficiaries of benefits under the plan falls comfortably within the scope of ERISA's definition of fiduciary duties with respect to plan administration." *Mogel*, 547 F.3d at 27 (citing *Varity Corp.*, 516 U.S. at 502); *see Pegram*, 530 U.S. at 231 ("At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries."). Accordingly, Lincoln's decision to pay Edmonson via the SecureLine Account constituted a discretionary act of plan management or administration, and Lincoln was subject to ERISA's fiduciary duties when it performed this act.

Lincoln's selection of the method of payment also involved exercising authority or control over plan assets, and triggered fiduciary duties for this independent and alternative reason. *See* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent . . . [he] exercises any authority or control respecting management or disposition of its assets . . . ."). It is undisputed that the policy is a plan asset. Under ERISA's guaranteed benefit exemption provision, when "a plan to which a guaranteed benefit policy is issued by an insurer," as here, "the assets of such plan shall

28

be deemed to include such policy." *Id.* § 1101(b)(2). Lincoln exercised authority and control over the policy when it selected the method of payment because Lincoln had discretion to determine the type of payment. Therefore, we conclude Lincoln acted as a fiduciary when it chose to pay Edmonson using the SecureLine Account for the alternative reason that this action involved exercising authority and control over plan assets.

2.

We now address whether the selection of the SecureLine Account as the method of payment was a breach of Lincoln's fiduciary duty. Edmonson contends the selection of the SecureLine Account as the method of payment breached Lincoln's duty of loyalty. ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). ERISA also prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." *Id.* § 1106(b)(1).

Lincoln and the amicus present several arguments for why payment via a retained asset account advances the interests of the beneficiary. For example, they argue some beneficiaries are grieving the loss of a close relative, and thus not in an ideal position to determine what to do with a large lump sum of money. But these arguments miss the mark. The issue is not whether the retained asset account is in the interest of the beneficiary; rather, the issue is whether

Lincoln's selection of the retained asset account was "solely in the interest" of Edmonson and "for the exclusive purpose" of providing benefits to her. *See id.* § 1104(a)(1)(A).

The purpose of establishing the SecureLine Account was to pay Edmonson benefits. Lincoln did not directly gain any financial benefit from this decision. Nevertheless, Edmonson contends this decision was not solely in her interest because it put Lincoln in a position where it might profit by investing the retained assets. When compared to payment via a check, Edmonson asserts, payment via a retained asset account was better for Lincoln because it created the potential for profit. This increased potential for profit, a potential that is wholly dependent on Edmonson's actions, is insufficient to result in a breach of Lincoln's fiduciary duties.

"'ERISA does not mandate any specific mode of payment for . . . benefits.'" *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1457 (10th Cir. 1991) (quoting *Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1218 (9th Cir. 1988)); *see Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 916 (2d Cir. 1982) ("Neither [ERISA] nor its legislative history comments on the mode or manner in which benefits should be paid."). "[T]he retained-asset account method of payment is not in itself necessarily inconsistent with ERISA," *Vander Luitgaren v. Sun Life Assurance Co. of Canada*, No. 09-11410, 2012 WL 5875526, at *11 (D. Mass. Nov. 19, 2012), and it "is inconsistent with ERISA's goals to prohibit this type of arrangement." *Merrimon v. Unum Life Ins. Co. of Am.*, 845 F. Supp. 2d 310, 320 (D. Me. 2012). Accordingly, we conclude Lincoln did not breach its fiduciary

duties when it exercised its discretion to pay Edmonson with a retained asset account.[14]

Finally, even assuming there was a breach, Edmonson is not entitled to relief because the breach did not directly cause the injury for which she seeks relief, Lincoln's investment for its own profit. ERISA requires a plaintiff to show that the injury was a proximate cause of the breach of duty. *Willett v. Blue Cross and Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992). Had Lincoln never invested the retained assets, or given Edmonson all the profit it earned, she would have suffered no injury. Payment via the retained asset

---

[14] Edmonson also challenged the amount of interest ultimately paid to her, but we do not consider this challenge to relate to Lincoln's initial decision to create and set the terms for the SecureLine Account. The *minimum* interest rate Lincoln would pay, as set forth in the SecureLine Account's Terms and Conditions, was 1% above the average rate published by Bloomberg for interest-bearing checking accounts. Edmonson does not argue that this initial decision on what minimum interest rate to pay her violated ERISA.

Rather, Edmonson argues that Lincoln chose not to pay her *above* that minimum rate, thereby profiting from its investment of the retained assets. Axiomatically, Lincoln's decision not to pay her a higher interest rate allowed it to profit from the investment of the retained assets. Accordingly, we do not consider Lincoln's decision on the interest ultimately paid to Edmonson to constitute an independent discretionary act. Instead, we treat Lincoln's decision not to pay Edmonson more interest as identical to its decision to profit from the investment of the retained assets.

account, by itself, caused her no injury. The establishment of the account neither guaranteed or commanded that Lincoln take the later act of investing the assets for its own profit. And, importantly, Edmonson could have prevented Lincoln from investing the retained assets by withdrawing them from the SecureLine Account.[15] Accordingly, we conclude Edmonson is not entitled to the disgorgement of Lincoln's profit based on its decision to establish the SecureLine Account.

## B. Investment of the Retained Assets

Edmonson also argues that Lincoln breached its fiduciary duties when it invested the retained assets for its own benefit. She contends this act is governed by ERISA because it involved the management or administration of a plan or, alternatively, the exercise of authority or control over

---

[15] This conclusion does not conflict with our earlier conclusion that the decision to invest the retained assets was "fairly traceable" to the establishment of the SecureLine Account for purposes of Article III standing. The "fairly traceable" requirement for constitutional standing sets a lower bar than the showing of causation required on the merits. *See The Pitt News*, 215 F.3d at 360-61 (treating constitutional causation as akin to but-for causation); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) ("As other courts have noted, Article III's causation requirement demands 'something less than the concept of proximate cause.'" (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003))).

plan assets. She argues Lincoln's decision to invest the retained assets for its own profit violated its duty of loyalty.

1.

As noted, Edmonson contends the investment of the retained assets involved the management or administration of the plan. Lincoln argues that it was no longer managing or administering the plan once it set up the SecureLine Account, but rather was in a creditor-debtor relationship with Edmonson when it invested the retained assets. *See Faber*, 648 F.3d at 105 (holding the insurance company discharged its fiduciary duty when it established the retained asset account in accordance with the insurance policy). Lincoln analogizes its relationship with Edmonson at that time to that of a customer and a bank, as the bank will invest a customer's deposited assets for its own profit, and pay interest to the customer in an amount less than the profit it earns.

Nothing in the plan or policy provides that Lincoln had any duty with respect to managing or administering the plan beyond its payment of benefits to Edmonson. Nor has Edmonson argued that anything in the plan or policy required Lincoln to perform any act of plan management or administration once it paid her the benefits. Rather, she contends Lincoln failed to "pay" her as required under the policy, arguing that the establishment of the SecureLine Account did not constitute payment of the benefits.

Edmonson directs our attention to *Mogel*, in which the court stated "when UNUM says that plaintiffs had been paid, referring to the sums already deemed to belong to Plaintiffs, it obscures reality." 547 F.3d at 26 (quotation omitted). The

33

court concluded "the euphemistically named 'Security Account,' accompanied with a checkbook, was no more than an IOU which did not transfer the funds to which the beneficiaries were entitled out of the plan assets and hence UNUM remained a fiduciary with respect to those funds." *Id.* at 27. Accordingly, the court held UNUM was still subject to fiduciary duties even after it set up the retained asset account.

Edmonson contends that, like in *Mogel*, Lincoln failed to fulfill its obligation to "pay" her, and thus was still managing or administering the plan when it invested the retained assets. But the terms of the policy in *Mogel* required an immediate lump sum payment upon receipt of proof of a claim. Because the policy here is silent as to the form of payment, Lincoln had discretion as to how to comply with its requirements, under its contractual obligations and, as we concluded above, under ERISA. Accordingly, Lincoln fulfilled its obligation to pay Edmonson when it established the SecureLine Account.[16]

Lincoln, relying on *Faber*, argues that once it satisfied its obligation to pay the benefits, it was no longer managing or administering the plan. In *Faber*, the Court of Appeals for the Second Circuit held

---

[16] Edmonson cites to several authorities for the proposition that debts must be paid in cash or check unless otherwise agreed upon, and thus Lincoln violated the plain terms of the plan by not paying her with a check. But these cases are inapposite. They only hold that forms of payment such as a security or a mortgage cannot be used to pay a debt. *See, e.g.*, *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 259 (2d Cir. 2010).

> MetLife discharged its fiduciary obligations as a claims administrator and ceased to be an ERISA fiduciary when, in accordance with the Plans, it created Plaintiffs' [retained asset accounts], credited them with the amount of benefits due, and issued checkbooks enabling Plaintiffs to withdraw their proceeds at any time. Thus, MetLife was not acting in a fiduciary capacity when it invested the funds backing Plaintiffs' [retained asset accounts].

*Faber*, 648 F.3d at 104. The court continued, "[n]othing in the [plans], or in the complaint, provides any indication that after the [retained asset accounts] were established either Plaintiffs or MetLife contemplated an indefinite fiduciary relationship." *Id.* at 105. "To the extent MetLife remained obligated to honor the account holder's 'checks' and pay interest at a guaranteed rate, we believe that this arrangement constituted a straightforward creditor-debtor relationship governed by the Customer Agreements and state law, not ERISA." *Id.* We agree.

Nonetheless, Edmonson contends Lincoln's fiduciary duties over management and administration of the plan continued after it established the SecureLine Account even if Lincoln had fulfilled its obligations to her under the plan. She relies largely on the following quote from *Varity Corp. v. Howe*:

> There is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory

35

regime; it also includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan. Indeed, the primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime. If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose.

516 U.S. at 504 (emphasis omitted) (quoting G. Bogert & G. Bogert, *Law of Trusts and Trustees* § 551, at 41-52). Based on this quote, Edmonson contends whether Lincoln was acting as a fiduciary when it invested the retained assets requires us to go beyond the question of whether Lincoln had satisfied its duties under the plan.

Edmonson takes the Supreme Court's quotation from *Varity Corp.* out of context. In *Varity Corp.*, the relevant issue was whether Varity, who acted as both the employer and the benefits plan administrator, was managing or administering the plan when it made misrepresentations to the employees about the viability of the plan. *Id.* at 494-95. The defendant asserted that because its representations were not required by the plan, it acted in its role as employer, and not as plan administrator. *Id.* at 495. The Court rejected this argument with the rationale quoted above. Accordingly, the Court stated that even if an act is not required by the plan, it may implicate fiduciary duties.

*Varity Corp.* does not suggest that Lincoln's fiduciary duty to administer the plan continued after it satisfied its

contractual duty to pay Edmonson her benefits, nor did it implicate a fiduciary's obligation to manage or administer a plan. We find *Faber*'s rationale persuasive and conclude Lincoln had completed its obligations with respect to managing or administering the plan once it established the SecureLine Account. Accordingly, Lincoln was not managing or administering the plan when it invested the retained assets.

2.

Edmonson alternatively argues that Lincoln was acting as a fiduciary when it invested the retained assets because that act involved exercising authority or control over plan assets. *See* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent (i) he . . . exercises any authority or control respecting management or disposition of its assets . . . ."). Lincoln contends the retained assets were not plan assets. We agree.[17]

"[I]n the absence of specific statutory or regulatory guidance," as here, "the term 'plan assets' should be given its ordinary meaning, and therefore should be construed to refer to property owned by an ERISA plan." *Sec'y of Labor v. Doyle*, 675 F.3d 187, 203 (3d Cir. 2012) (citing *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005)). "This approach is also consistent with guidance provided by the Secretary [of Labor]

---

[17] Lincoln also argues that it did not have authority or control over the retained assets because Edmonson had the ability to withdraw the entire balance from her retained asset account at any time. Based on our conclusion that the retained assets were not plan assets, we do not reach this argument.

37

on the meaning of 'plan assets,' which states that 'the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. In general, the assets of a welfare plan would include any property, tangible or intangible, in which the plan has a beneficial ownership interest.'" *Id.* (quoting Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)).[18]

The *Faber* court applied this approach and concluded the "'retained assets' are not 'plan assets' because the Plans do not have an ownership interest—beneficial or otherwise—in them." *Faber*, 648 F.3d at 106. The court explained that once the retained asset accounts were created, the insurance company's "remaining obligations are to honor checks drawn on the [retained asset accounts] and to pay interest at the stipulated rate." *Id.* It concluded that "under ordinary notions

---

[18] The parties agree the assets held by Lincoln *before* Edmonson submitted her claim were not plan assets, under the guaranteed benefit policy exemption of ERISA. This provision provides, "[i]n the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer." 29 U.S.C. § 1101(b)(2). The parties also appear to agree that this exemption no longer applied once Lincoln established the retained asset account for Edmonson. While the amicus finds the guaranteed benefit exemption to be significant, arguing that the assets would not "suddenly" turn into plan assets, we, like the parties, do not place much emphasis on it.

of property rights, this relationship involves MetLife simply as a debtor and the beneficiary-turned-account holder simply as a creditor—a relationship fundamentally different from an ERISA fiduciary relationship with its panoply of discretionary authority and responsibility." *Id.*

In reaching its conclusion, the *Faber* court relied in part on an amicus brief/opinion letter submitted by the Secretary of Labor, in which the Secretary argued, *inter alia*, that the retained assets were not plan assets. The Secretary posited that the ordinary notions of property rights determine whether an asset is a plan asset, and considered whether anything in the plan documents or elsewhere gave the plans an ownership interest in the retained assets, noting that "whether a particular asset is a 'plan asset' requires a factual inquiry into the parties' representations and understandings." Brief of U.S. Dep't of Labor at 12, *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98 (2d Cir. 2011). The Secretary concluded there was no evidence the plan had an ownership interest in the retained asset, and thus the retained assets were not plan assets. The *Faber* court adopted this conclusion.

Lincoln urges us to pay deference to the Secretary's opinion under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Under *Skidmore*, we defer to the Secretary's opinion letter based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 140. We see no reason to disagree with the Secretary's legal argument that the ordinary notions of property rights determine whether an asset is a plan asset, and that we should look to the plan and the plan documents in making this determination. Furthermore, *Doyle* suggests this

already is the law in our circuit. *See Doyle*, 675 F.3d at 203. But as the Secretary states, whether specific assets are plan assets is ultimately a factual inquiry, so we must turn to the specific facts here to make this determination.[19]

Edmonson has not identified anything in the plan or policy documents that supports a conclusion the plan retained an ownership interest in the retained assets after Lincoln established the SecureLine Account. Edmonson argues the plan had an ownership interest in the retained assets because Lincoln kept the money in its general account until a draft was presented for payment, rather than depositing the funds in the bank backing the SecureLine Account, and if Lincoln failed to pay them over to her, the plan would be liable. But Edmonson cites to no authority for this proposition, and does not point to any provision in the plan or policy to support it. Even if the plan could be compelled to enforce its rights against Lincoln, that right is not equivalent to an ownership stake in Lincoln's general account funds.

Edmonson contends we should follow *Mogel* and conclude the retained assets were plan assets because payment via a retained asset account failed to satisfy Lincoln's duty to pay her. As discussed, we disagree that

---

[19] Edmonson urges us to disregard the analysis in the letter brief because the recent decision in *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012), casts doubt on paying deference to such briefs. The *Christopher* opinion, however, focused primarily on whether the briefs in that case were persuasive, so Edmonson's argument that *Christopher* generally casts doubt on the legitimacy of amicus briefs from the Secretary is unavailing. *See id.* at 2169-70.

Lincoln failed to fulfill its obligation to pay Edmonson. Moreover, we do not read *Mogel* as holding the retained assets were plan assets. The *Mogel* court, after finding the insurance company had not discharged its contractual duties under the policy to pay a lump sum, concluded "the sums due plaintiffs remain plan assets subject to UNUM's fiduciary obligations until actual payment." *Mogel*, 547 F.3d at 26. The *Mogel* court, however, did not mention that plan assets are to be determined based on the ordinary notions of property rights, nor it did consider the definition of plan assets. Rather, as the *Faber* court stated, "*Mogel* is better understood as predicated on the fact, not present here, that the insurer failed to abide by plan terms requiring it to distribute benefits in lump sums," and thus was still managing or administering the plan. *Faber*, 648 F.3d at 106-07; *see also Merrimon*, 845 F. Supp. 2d at 318-19 (explaining that *Mogel*'s "core holding" "did not require the First Circuit to find that the sums due to those plaintiffs were plan assets," and opining that "if the First Circuit were required to address the issue squarely, it would not hold that the funds backing the [retained asset accounts] in this case are plan assets"); *Vander Luitgaren*, 2012 WL 5875526, at *8 (similarly finding *Mogel* should not be interpreted as holding the retained assets were plan assets). Accordingly, *Mogel* provides little support for Edmonson's argument that the retained assets were plan assets.

Alternatively, Edmonson urges us to apply the "functional approach" to determining whether an asset is a plan asset, as set forth by the Court of Appeals for the Ninth Circuit in *Acosta v. Pacific Enterprises*, 950 F.2d 611 (9th Cir. 1991). Under *Acosta*, an asset is a plan asset when "the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants

or beneficiaries." *Id.* at 620. We recently stated, albeit in dicta, that "this approach may be helpful when considering whether items other than cash or financial instruments are properly considered assets of an ERISA plan." *Doyle*, 675 F.3d at 203 n.33. In a later footnote in that opinion, we stated the "Supreme Court has also strongly suggested that [the approach based on ordinary notions of property rights] is the proper approach to defining 'plan assets.'" *Id.* at 204 n.34 (citing *Jackson v. United States*, 555 U.S. 1163 (2009)).[20]

*Doyle* suggests that we should not apply the *Acosta* approach, as the assets in question are cash or financial instruments. *Cf. Acosta*, 950 F.2d at 620 (considering whether a participant-shareholder list was a plan asset). In any event, the assets at issue are not plan assets under *Acosta*. Although Lincoln used the assets for its own benefit, it did not use them "at the expense of plan participants or beneficiaries." *Id.*

We conclude the retained assets were not plan assets. In short, once Lincoln set up the SecureLine Account, the plan no longer had an interest in the assets and, under ordinary notions of property rights, Lincoln and Edmonson were in a creditor-debtor relationship. Accordingly, Lincoln's conduct was not constrained by ERISA's duty of loyalty.

## VI. Conclusion

---

[20] In *Jackson*, the Court vacated the lower court's decision in light of the Solicitor General's brief, which argued for the application of the ordinary notions of property rights approach. *See Doyle*, 675 F.3d at 204 n.34.

We conclude Lincoln did not breach its fiduciary duties under ERISA when it chose to pay Edmonson with a retained asset account and then invested the retained assets for its own profit. The decision to pay Edmonson with the retained asset account did not breach Lincoln's duty of loyalty to her. And when Lincoln then invested the retained assets, it was not acting in a fiduciary capacity. Accordingly, we will affirm the judgment of the District Court.

*Edmonson v. Lincoln Nat'l Life Ins. Co.,* No. 12-1581 (appeal from E.D. Pa. Case No. 10-4919, Baylson, J.)

JORDAN, *Circuit Judge*, Dissenting.

I agree with the Majority and the District Court that Lincoln should win this case, but I would vacate and remand for dismissal of the complaint because Edmonson lacks both constitutional and statutory standing, since she abandoned her claim for injunctive relief under ERISA and seeks only the payment of funds she claims that Lincoln wrongfully retained. I would not reach the issue of the alleged breach of Lincoln's fiduciary duty under ERISA.

"To bring a civil action under ERISA, a plaintiff must have constitutional, prudential, and statutory standing." *Leuthner v. Blue Cross & Blue Shield of Ne. Pa.*, 454 F.3d 120, 125 (3d Cir. 2006). Constitutional standing, as the Majority points out, requires three elements: injury-in-fact, a causal connection between that injury and the complained-of conduct, and the likelihood that the injury can be redressed by court action. As to the first element, it is well-established that "[a]n injury-in-fact must be a palpable and distinct harm that[] ... affect[s] the plaintiff in a personal and individual way." *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010) (internal quotation marks omitted).

The Majority seems to treat a plaintiff demanding disgorgement as a special case for purposes of the injury-in-fact requirement of Article III standing. It suggests that a plaintiff seeking that remedy need not demonstrate an actual injury because "[a] requirement of a net financial loss would allow fiduciaries to retain ill-gotten profit – exactly what disgorgement claims are designed to prevent – so long as the

1

breaches of fiduciary duty do not harm the plan or beneficiaries." (Majority Op. at 12-13.) Thus, the Majority concludes that "the nature of disgorgement claims suggest[s] that a financial loss is not required for standing, as a loss is not an element of a disgorgement claim." (*Id.* at 13)[1]

That conclusion, however, runs counter to our holding in *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003). In that case, an ERISA plan participant alleged that a fiduciary had violated an ERISA requirement that a fiduciary disclose "all material facts relating to the insurance benefits it provides." *Id.* at 453 (internal quotation marks omitted). In particular, the plaintiff said that the fiduciary had failed to disclose certain physician incentives that had the potential to decrease the overall quality of care provided. *Id.* Although the plaintiff did not allege that she had been personally affected by the existence of the incentives or that the care that she received under the plan was in any way deficient, she sought both injunctive relief as well as restitution or disgorgement of the amount by which

---

[1] The Majority finds support for that conclusion in the "principles of ERISA" whose "duty of loyalty bars a fiduciary from profiting even if no loss to the plan occurs." (Majority Op. at 13.) That approach conflates constitutional and statutory standing in a manner that is particularly inapt in this case. Although "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing," that is only true "with regard to injunctive relief." *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450, 456 (3d Cir. 2003) (citation and internal quotation marks omitted). But that is not the relief that Edmonson is seeking.

2

she and other members of the putative class had supposedly overpaid as a result of the fiduciary's failure to make the required disclosures. We decided that a plaintiff claiming a fiduciary breach under ERISA "need not demonstrate actual harm in order to have standing to seek injunctive relief" to require a fiduciary to comply with ERISA, but that "requests for restitution and disgorgement, both of which are individual in nature[,] ... require her to demonstrate individual loss." *Id.* at 456.

It is true, as the Majority insists, that *Horvath* is different from the present case. The plaintiff's claim there was "premised on her argument that her firm overpaid for the healthcare she received," *id.*, and there was no other evidence of individual harm. In this case, by contrast, as the District Court observed, "Plaintiff alleged that she suffered an individual loss, measured as the 'spread' or difference between the interest that Defendant allegedly earned on the benefits in Plaintiff's SecureLine account, and the interest that Defendant paid to Plaintiff." *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 777 F. Supp. 2d 869, 881 (E.D. Pa. 2011).[2]

_____

[2] The District Court concluded that that was "a sufficient allegation of injury in fact, caused by defendant's conduct" to establish Article III standing. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 777 F. Supp. 2d 869, 881 (E.D. Pa. 2011). The Court, however, considered standing only in response to Lincoln's motion to dismiss. The Court declined to follow a case cited by Lincoln in support of its argument that Edmonson lacked standing because, in the Court's view, it "imposed too high a burden on a plaintiff with respect to the jurisdictional allegations on a Rule 12(b)(1) motion," *id.*, but the Court did not revisit the issue at the summary

3

But in an important and dispositive respect the cases are the same: just as the plaintiff in *Horvath* "concede[d] that the care and coverage she received as a member of [her employer's] HMO was never affected by the existence of physician incentives," 333 F.3d at 456, Edmonson effectively concedes that she received everything to which she was entitled under her husband's employer's plan. *See Edmonson*, 777 F. Supp. 2d at 875 (noting that Edmonson agreed at oral argument that she had received both her "claimed benefit, in the amount of $10,000.00[,] plus $138.08 interest" by check shortly after she decided to close her SecureLine Account). Moreover, Edmonson has adduced no evidence that, if she had been paid in a lump sum rather than through a retained asset account, she would have invested her death benefit and generated the same profit or "spread" that she now seeks to reclaim from Lincoln. She has merely hypothesized a greater benefit, had Lincoln administered the plan in a different way than it did. That ought not be enough. *See Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 119 (2d Cir. 2009) (finding that an ERISA plan participant's lost opportunity to receive higher benefits did not constitute an injury-in-fact); *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 611 (6th Cir. 2007) (holding that plaintiffs who claimed damage based on "what they would have received if the[ir] [employer's] plan were re-formed to meet the requirements of ERISA" failed to allege an injury-in-fact). Thus, although Edmonson may have attempted to individualize her claim by basing it on the lost spread, her injury remains "entirely speculative" and "hypothetical at best," and she accordingly

judgment stage, even though Edmonson had provided no further evidence of an injury-in-fact.

lacks the "irreducible constitutional minimum of standing," which is "an injury in fact that is … actual or imminent, not conjectural or hypothetical." *Drutis*, 499 F.3d at 611 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted).[3]

The Majority correctly observes that "[o]ur decision in *Horvath* did not revolve around whether the plaintiff suffered a financial loss." (Majority Op. at 15.) It did, however, turn on the question of whether the plaintiff had demonstrated an *individual* loss, i.e., an actual injury to that particular plaintiff. That showing is required when a plaintiff is seeking individual relief under ERISA. *See In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 159 (3d Cir. 1999) (holding that a plaintiff seeking individual relief under ERISA § 502(a)(3), in

---

[3] That is also the conclusion that the United States District Court for the Southern District of New York reached in *Faber v. Metro. Life Ins. Co.*, No. 10588(HB), 2009 WL 3415369 (S.D.N.Y. Oct. 23, 2009), *aff'd*, 648 F.3d 98 (2d Cir. 2011), on identical facts. *See id.* at *5 (noting that "this pool of funds to which [Plaintiffs] claim entitlement is not 'identifiable and quantifiable;' rather, to identify and quantify any measure of relief for the Plaintiffs would require an accounting to determine what amount of funds allegedly should be reclaimed by the Plaintiffs and the putative class"); *id.* (noting that "Plaintiffs do not – and cannot – deny that they have received the full amount of benefits to which they were entitled"). Edmonson's claim for disgorgement is similarly based not on a particular amount of interest due to her, but rather on an unidentified amount of investment profit that Lincoln allegedly earned while her SecureLine assets were in its possession.

contrast to §502(a)(2), which allows relief on behalf of a plan, is required to prove an individual loss). Yet the Majority appears to conclude, as one other court has, that *Horvath* requires only that an ERISA plaintiff demonstrate that she, rather than the plan, was "personally affected by the alleged breach." *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 200 (2d Cir. 2005) (interpreting *Horvath*'s "individual loss" requirement). That unduly lax formulation effectively eliminates the injury-in-fact requirement, as virtually any breach of fiduciary duty to a plan can be said to "personally affect" a plan participant through its impact on the plan itself.

The Majority believes the meaning of *Horvath* to be that either "a plan has the right to the profit, [and] the individual plaintiff has not suffered a constitutional injury," or else the plaintiff "has an individual right to the defendant's profit" and she has suffered an injury-in-fact. (Majority Op. at 16-17.) That, however, presupposes that there are only two possibilities when a breach of an ERISA fiduciary duty is alleged. There is, however, a third possibility: that neither the plan nor the individual is entitled to the defendant's profit. That would be the case when a plan permitted the fiduciary to retain and invest funds pending the payment of a benefit, and the plaintiff received the fixed amount to which she was entitled, as is argued to be the case here. And in such a case, neither the plan nor the individual can rightly allege an injury-in-fact based on not having received something to which neither was entitled, regardless of whether the defendant breached its fiduciary duty.[4]

---

[4] As discussed *infra*, the remedy for a fiduciary breach in such circumstances is not damages, but rather an injunction

6

In other words, any right to the profit generated with plan assets, the loss of which is now said to be an injury-in-fact, does not automatically follow from the alleged breach, at least not in a defined benefit plan of the type at issue here. *Cf. Harley v. Minn. Min. & Mfg. Co.*, 284 F.3d 901, 905-06 (8th Cir. 2002) (discussing the "proper focus" of the standing inquiry in an action "to seek relief …for [a] particular breach of duty, given the unique features of a defined benefit plan"). As the term implies, a defined benefit plan entitles a participant to no more than her benefit as defined. "[T]he employee, upon retirement, is entitled to a fixed periodic payment." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (citation and internal quotation marks omitted). As a result, "the employer typically bears the entire investment risk and ... must cover any underfunding as the result of a shortfall that may occur from the plan's investments." *Id.* But, "[s]ince a decline in the value of a plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus ... ." *Id.* at 440.

In this case, the defined amount to which Edmonson was entitled was her $10,000 death benefit – a fixed entitlement that remained in place after her SecureLine Account was established, even if Lincoln had lost money investing the funds backing that account. Having no claim on the profits, she cannot claim an individual loss – or even that she was "personally affected" – by not receiving a share of those profits. And "the limits on judicial power imposed by

or "other appropriate equitable relief," i.e., the remedy provided under ERISA § 502(a)(3).

7

Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan." *Harley*, 284 F.3d at 906.

Notwithstanding the requirements of Article III, and worried that imposing a loss requirement would mean that fiduciaries could "retain ill-gotten profit … so long as the breaches of fiduciary duty do not harm the plan or beneficiaries" (Majority Op. at 13), the Majority treats an action for disgorgement as *sui generis*. The Majority says that an ERISA plaintiff seeking disgorgement of profits to which she claims entitlement need only plead that there has been a breach and that the plan itself is not entitled to recover. But our decision in *Horvath* states quite plainly that a fiduciary duty breach is sufficient to confer standing on an ERISA plaintiff only "with regard to injunctive relief." 333 F.3d at 456. That is not the relief that Edmonson is seeking, so, per our own binding precedent, she does not have constitutional standing to press her claim.[5]

---

[5] Relying on our reasoning in *Horvath*, the Second Circuit has come to the same standing conclusion in two cases closely resembling this one. First, in *Kendall v. Employees Retirement Plan of Avon Products*, 561 F.3d 112 (2d Cir. 2009), an ERISA plan participant took issue with a provision that partially offset social security payments against plan benefits based on a formula that penalized certain retirees. The plaintiff claimed injury on the grounds that "the Offset under the Plan prevents her from realizing higher benefits," *id.* at 119, and argued that her employer could either adjust the formula to spread it more evenly or eliminate the offset altogether, *id.* at 119 n.14. The Court observed that

8

the plaintiff "concedes that her future benefits under a modified Plan that conforms to ERISA are not yet determined" and held that her "claim, that she would receive more in benefits were the Offset to be eliminated or the Plan modified to conform to ERISA, is not an injury-in-fact." *Id.* at 122. The Court also noted that "the best [plaintiff] offers the court is a calculation of how a hypothetical Plan participant would be injured" by the offset provision of the plan. *Id.* Edmonson has not even provided such a hypothetical calculation of her lost "spread."

Second, in *Faber v. Metropolitan Life Insurance Co.*, 648 F.3d 98 (2d Cir. 2011), as in this case, an ERISA plan beneficiary complained that her benefit had been paid in the form of a retained asset account rather than in a lump sum. The Court noted that "[i]n the ERISA context, we have drawn a distinction between constitutional standing to seek injunctive relief and constitutional standing to seek disgorgement." *Id.* at 102. The Court concluded that "[plaintiff] need not demonstrate actual harm in order to have standing to seek *injunctive relief* requiring that [defendant] satisfy its statutorily-created … fiduciary responsibilities," but that "[o]btaining restitution or disgorgement under ERISA requires that a plaintiff satisfy the strictures of constitutional standing by demonstrating individual loss; to wit, that they have suffered an injury-in-fact." *Id.* (alterations and emphasis in original) (quoting and citing *Horvath*, 333 F.3d at 456-57) (internal quotation marks omitted). The only reason that the *Faber* Court did not dismiss the action based on standing was that that plaintiff was seeking injunctive relief against the insurer as well. *See id.* at 103 (agreeing with the district court "insofar as it concluded that Faber has constitutional standing

9

In addition to constitutional standing,"[t]o bring a civil action under ERISA, a plaintiff must have … statutory standing." *Leuthner*, 454 F.3d at 125. The inquiry into statutory standing requires a court to determine "whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress [her] injury." *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) (emphasis in original). Under ERISA § 502(a)(3)(B), "[a] civil action may be brought … by a participant, beneficiary, or fiduciary … to obtain ... appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).[6] Thus, "the statute authorizes *appropriate* equitable relief[,] [and] [w]e should expect that courts, in fashioning appropriate equitable relief, will keep in mind the special nature and purpose of employee benefit plans, and will respect the policy

---

to seek injunctive relief"). Again, that is not the relief that Edmonson seeks in this case.

[6] In its analysis of statutory standing, the District Court focused only on whether Edmonson was a "beneficiary" within the meaning of ERISA § 502(a)(3) when she commenced this lawsuit, given that her claim had already been paid in full. The Court concluded that she was, because "plaintiff's status [is] measured at the time the breach of fiduciary duty occurred, rather than the time of the appeal." *Edmonson*, 777 F. Supp. 2d at 882 (citing *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 78 (3d Cir. 2001)). The Court did not consider whether she lacks statutory standing based on the relief that she seeks.

10

choices reflected in the inclusion of certain remedies and the exclusion of others." *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) (emphasis in original) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987)) (internal quotation marks omitted); *see also id.* at 497 (noting Congress's "desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place").

The statutory standing problem for Edmonson is that, as we said in *Horvath*, "claims for restitution and disgorgement [under ERISA 502(a)(3)] are likely barred by the Supreme Court's ... decision in *Great-West* [*Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002)]." *Horvath*, 333 F.3d at 457 n.3. In *Great-West Life*, the Court pointed out that ERISA § 502(a)(3) provides only equitable relief, *see* 534 U.S. at 209-10, and then said that whether relief for an ERISA fiduciary breach is cognizable as equitable relief under that section "depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought," *id.* at 213 (quoting *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)) (internal quotation marks omitted). The Court noted that "[a]lmost invariably ... suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for a loss resulting from the defendant's breach of legal duty." *Id.* at 210 (citation and internal quotation marks omitted). It concluded that, "[i]n cases in which the plaintiff could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for

11

some benefit the defendant had received from him, the plaintiff had a right to restitution *at law … .*" *Id.* at 213 (internal quotation marks omitted). By contrast, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.

The "disgorgement" Edmonson seeks is nothing more than compensation for an alleged loss allegedly caused by an alleged breach of Lincoln's fiduciary duty. In other words, it is precisely the type of relief that *Great-West Life* said was legal, not equitable. The Majority's discussion of disgorgement in support of its conclusion that Edmonson has constitutional standing makes that clear. The Majority says that the purpose of an action seeking disgorgement, at least in the ERISA context, is "to deter the fiduciary from engaging in disloyal conduct by denying him the profits of his breach" (Majority Op. at 13), and that the fiduciary "is liable for any profits he has made through his breach of trust," (*id.* at 14 n.5 (internal quotation marks omitted)). If that is the case, then it is difficult to see how Edmonson's claim for "disgorgement" is anything other than an attempt to "impose personal liability on the defendant," *Great-West Life*, 534 U.S. at 214, for "the defendant's breach of legal duty," *id.* at 210. That certainly has all the marks of legal relief that is unavailable under § 502(a)(3). *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) ("Although they often dance around the word, what petitioners seek is nothing other than compensatory *damages* – monetary relief for all losses [they] sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of *legal* relief." (emphasis in original)).

12

Perhaps in an effort the avoid that problem, the Majority recasts disgorgement as an "accounting for profits" for purposes of statutory standing, so that it falls within an exception to *Great-West Life*'s bar on § 502(a)(3) actions that seek to impose personal liability on a defendant. *See Great-West Life*, 534 U.S. at 214 n.2 (recognizing a "limited exception for an accounting for profits, a form of equitable restitution").[7] There are two problems with that rhetorical shift. First, an accounting is only proper when "a plaintiff is entitled to a constructive trust on particular property held by the defendant, [so that] he may also recover profits produced by the defendant's use of that property." *Id.*; *see also Unisys Corp. Retiree Med. Benefits ERISA Litig. v. Unisys Corp.*, 579 F.3d 200, 238 (3d Cir. 2009) ("[T]he question here is not whether disgorgement of profits or accounting for profits is an equitable remedy, but rather whether the plaintiffs have demonstrated that their claims for relief meet the requirements for applying this type of remedy.").[8]

---

[7] We recognized an equitable restitution claim under ERISA in *Plucinski v. I.A.M. National Pension Fund*, 875 F.2d 1052 (3d Cir. 1989), holding that "there is an equitable cause of action by employers for the recovery of contributions erroneously paid to pension funds due to a mistake of fact or law." *Id.* at 1057. However, we characterized restitution as an equitable remedy only to the extent that the plan sponsor had made an "honest mistake" and limited its recovery to the specific amount erroneously paid into the pension fund. *Id.* at 1058. But we held that equitable restitution does not include an award of interest on that amount for the time it was held by the fund. *Id.* at 1058 n.6. That is, in essence, the remedy that Edmonson seeks in this case.

[8] The Supreme Court explicitly characterized an

---

13

Entitlement to a constructive trust in turn, requires that "the defendant (i) has been unjustly enriched (ii) by acquiring legal title to specifically identifiable property (iii) at the expense of the claimant or in violation of the claimant's rights ... ." Restatement (Third) of Restitution and Unjust Enrichment § 55 cmt. a (2011). Thus, a "[c]onstructive trust is the principal device for vindicating equitable ownership against conflicting legal title ... ." *Id.* This case presents exactly the opposite situation. Here, legal title passed to Edmonson when Lincoln established her SecureLine Account. Lincoln had no legal title to the funds, nor was Edmonson left with a mere equitable claim, during the period for which she contends that she is entitled to the excess spread. So this case does not present the circumstances in which a plaintiff would be entitled to the remedy of a constructive trust or an accounting for the profits on that trust. *See Unisys*, 579 F.3d at 238 (concluding that plaintiffs could not recover under § 502(a)(3) where the requirements for an accounting for profits were not met).[9]

---

accounting for profits, requiring entitlement to a constructive trust, as a "limited exception" to what it concluded was ERISA's bar on standing to seek certain types of restitutionary relief. *Great-West Life*, 534 U.S. at 214 n.2. I therefore fail to see how Edmonson's ability to assert a constructive trust over the assets securing her SecureLine Account "goes to the merits of her claim, not statutory standing," as the Majority contends. (Majority Op. at 22 n.11.)

[9] The Majority cites *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193 (3d Cir. 2004) for the proposition that "[t]he disgorgement remedy is equitable even though Lincoln no longer ha[d] possession of the retained assets, making a

Second, according to § 51(4) of the Restatement of Restitution, the purpose of the restitutionary remedy of an accounting is to "eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." Thus, "[t]he profit for which the wrongdoer is liable by the rule of § 51(4) is the net increase in assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong." *Id.* § 51 cmt. e. In this case, the profit that Lincoln may (or may not) have generated is attributable to Edmonson's decision not to withdraw the funds from her SecureLine Account when she could have. The Majority itself acknowledges that. (*See* Majority Op. at 30 ("This increased potential for profit[] ... is wholly dependent on Edmonson's actions ... .").) There is thus no basis for an accounting for profits, and the limited exception that the *Great-West Life* Court recognized to its general rule that compensation for breach of a legal duty is unavailable under ERISA § 502(a)(3) does not apply to Edmonson's claim.

---

claim for a constructive trust unnecessary." (Majority Op. at 22.) In that case, we held that a beneficiary had an equitable claim for interest during the period that payment of a benefit was delayed, *see Skretvedt*, 372 F.3d at 209, the contrary conclusion that we reached in *Plucinski*, *see supra* note 7. But that equitable claim was limited to the period during which the plan wrongly retained legal title to the funds, i.e., a period during which the requirements of a constructive trust were satisfied. *See Skretvedt*, 372 F.3d at 209 (analogizing the claimed interest to "prejudgment interest" on a claim that had already been adjudicated). Thus, we did not hold in *Skretvedt* that disgorgement is an equitable remedy where the defendant no longer had legal title to the beneficiary's funds, as in this case.

As the Supreme Court has explained, in the context of claims arising under ERISA § 502(a)(3), "[e]quitable relief must mean *something* less than *all* relief." *Mertens*, 508 U.S. at 258 & n.8 (internal quotation marks omitted). "Respecting Congress's choice to limit the relief available under § 502(a)(3) to 'equitable relief' requires us to recognize the difference between legal and equitable forms of restitution. [When] petitioners seek only the former, their suit is not authorized by § 502(a)(3)." *Great-West Life*, 534 U.S. at 218. Because what Edmonson seeks under the label of "disgorgement" is in reality a claim for damages and is the only relief she seeks, she lacks both statutory standing and constitutional standing.

With all respect to my colleagues in the Majority, I would vacate the summary judgment for Lincoln and remand to the District Court with instructions to dismiss the complaint, based on Edmonson's lack of standing.[10]

---

[10] Although I would not reach the merits of Edmonson's appeal, it strikes me that the Majority's merits decision is at odds with its conclusions as to her constitutional and statutory standing. Constitutional standing requires, in addition to an injury-in-fact, "a causal connection between the injury and the conduct complained of – the injury has to be fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party ... ." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (alterations in original) (citation and internal quotation marks omitted). The Majority concludes that Lincoln's ability to generate a profit using the funds backing her SecureLine Account was "wholly dependent on Edmonson's actions," i.e., her decision not to withdraw all of

16

her funds as soon as the account was established, and that that "is insufficient to result in a breach of Lincoln's fiduciary duties." (Majority Op. at 30.) That suggests that Edmonson's claimed injury was "fairly traceable" to her own inaction, rather than to Lincoln's payment of her death benefit using a SecureLine Account, and that she has failed to plead causation for purposes of Article III standing.

Similarly, in order to claim statutory standing based on *Great-West Life*'s exception for an accounting for profits, Edmonson must demonstrate that those profits are "attributable to the underlying wrong." Restatement of Restitution § 51 cmt. e. Because the majority concludes that Lincoln has not breached its fiduciary duty, there is no "underlying wrong" that can be the subject of a restitutionary remedy. That further undercuts the Majority's conclusion that her claim for disgorgement is really an equitable claim for an accounting, and suggests that she lacks standing under ERISA § 502(a)(3).